642 P.2d 838
**STATE of Arizona, Appellee,**

v.

**Robert Lloyd EMERY, Appellant.**

**No. 5001.**

Supreme Court of Arizona,
En Banc.

Feb. 16, 1982.

Rehearing Denied March 23, 1982.

494

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Michael Jones, Asst. Attys. Gen., Phoenix, for appellee.

H. Louis Hiser and Thomas L. Kehm, Kingman, for appellant.

HAYS, Justice.

Appellant, Robert Lloyd Emery, was found guilty of first degree murder and

second degree burglary following a trial by jury. He was sentenced to death for the crime of first degree murder and to 10 years imprisonment for the crime of second degree burglary.

Following the jury trial on the murder and burglary charges and prior to a new jury trial scheduled on unrelated charges of aggravated assault, arson, armed robbery, and attempted murder, appellant entered into a plea bargain agreement. Under the terms of this agreement, the trial court judge was to determine appellant's guilt or innocence of the aggravated assault and armed robbery charges based on the grand jury transcript and the evidence presented during the suppression hearing which included appellant's confession. In return, the arson and attempted murder charges were dropped. Appellant was convicted and sentenced to concurrent terms of 15 years for aggravated assault and 22 years for armed robbery, both sentences to run consecutively with the 10-year term for burglary. Appellant appealed from these convictions and sentences.

A notice of appeal from the conviction and sentence of death was automatically filed pursuant to 17 A.R.S. Rules of Criminal Procedure, rule 31.2(b). We accepted jurisdiction in the case involving imposition of the death penalty pursuant to A.R.S. § 13–4031 and consolidated both cases on appeal in accordance with 17A A.R.S. Rules of Supreme Court, rule 47(e)(5). Reversed and remanded for proceedings consistent with this opinion.

The operative facts are set forth below. Additional facts pertinent to the resolution of the issues raised will be developed as necessary within the opinion.

On December 20, 1978, the appellant and the codefendant, Edward Gilliam, were charged by the same grand jury, in separate indictments, with a total of six crimes. All indictments stemmed from an initial investigation by the Mohave County Sheriff's Office into the crimes of aggravated assault, arson, armed robbery, and attempted murder which occurred on the night of December 14, 1978, in the home of the victim, Simon L. Buras.

Buras had heard someone outside his residence and had gone to the door to investigate. Two men hit him and dragged him into the house. Before leaving, the men severely beat Buras, ransacked his home and started a fire in the bathroom. The victim was able to crawl from the burning house. While in the hospital, he talked with a detective from the Mohave County Sheriff's Office and described his assailants. One of the men was tall and slender and was wearing a baseball cap. The second man was shorter and had a mustache. Buras was able to identify one of his assailants, the codefendant, Edward Gilliam, from a police photograph.

In addition to the information received from Buras, two sheriff deputies stated that men whose descriptions were similar to those of Emery and Gilliam had been observed at a bar on the night of the incident. After someone in the bar started to talk about the Buras fire, the two suspects ran outside and started their vehicle. Patrons gave the license plate number and a description of the car in which the men were seen. Based on the information obtained, a complaint and an arrest warrant were issued charging appellant and Edward Gilliam with aggravated assault, arson, attempted murder, and armed robbery. The men were arrested at different locations on December 16, 1978.

At the time of their arrests, neither man had been charged with the murder on December 11, 1978, of Diana Mary Coderre. When the murder occurred, the victim was living with Violet Diggens in her home in Lake Havasu City. Two men had entered the Diggens-Coderre home during the night of December 11, 1978. Mrs. Diggins awoke and saw a man in the hallway. She also observed a tall man at the kitchen sink washing his hands. Mrs. Diggins locked the door to her bedroom and escaped to the outside through a door located in the bathroom off her room. From her hiding place in some weeds near the house she observed two men who came out onto the patio and walked around the area. After the men

returned to the house and Mrs. Diggens saw headlights leave the driveway, she ran to a neighbor's house for help. The police arrived and found Diana Coderre dead in her bedroom. She had been stabbed three times.

During interviews with the police subsequent to the arrests on December 16, 1978, both men admitted being together on the night of December 11, 1978, and made statements implicating each other in the murder of Diana Mary Coderre.

Emery and Gilliam were also seen at the home of John Masopust, Sr., which was located about two miles from the Diggens-Coderre house. At approximately 2:00 a. m. on the morning of December 11, 1978, Masopust had allowed appellant and Gilliam to enter his house to use the telephone because they claimed that their car had run out of gas. Later, Masopust discovered that the tape recording machine on the telephone had been running during the "phone call." The tape contained a recording of appellant's voice as well as a dial tone which indicated that no one had actually been called.

On December 20, 1978, a grand jury indicted Robert Lloyd Emery with the crimes of aggravated assault, arson, armed robbery, and attempted murder arising out of the incident at Buras's house. In a second indictment, appellant was charged with first degree murder and second degree burglary in connection with the occurrences at the Diggens-Coderre house.

In his appeal from the first degree murder conviction, appellant advances eight arguments:

1) Appellant's confession was obtained in violation of the standards set forth in *Miranda v. Arizona* and its progeny;

2) The trial court erred in not suppressing the confession;

3) The trial court failed to exclude testimony of a prior inconsistent statement in violation of Rule 613(b), Arizona Rules of Evidence;

4) Appellant's arrest was based on an invalid arrest warrant;

5) Failure to bring appellant promptly before a magistrate for his initial appearance denied him a substantial right;

6) The probable cause determination was made by a biased grand jury;

7) The trial court committed fundamental error and denied appellant due process of law by not presenting to the jury Forms of Verdict distinguishing between felony-murder and first degree murder with premeditation as the bases for finding guilt;

8) Imposition of the death penalty under the felony-murder doctrine violated the eighth-amendment prohibition against cruel and unusual punishment when evidence of direct participation in the murder was insufficient.

Because all convictions, including the murder conviction, are reversed, the arguments relating to the Forms of Verdict and the eighth-amendment prohibition against cruel and unusual punishment will not be addressed.

## MIRANDA VIOLATION

Appellant was arrested on December 16, 1978, at approximately 2:30 p. m. and was held in an isolation cell until 10:00 p. m. when he was transported by car to the detectives' office. Upon arrival at the office, the officers played a 30-second tape recording of appellant's voice (the "Masopust tape") obtained from a telephonic message recorder located in the home of John Masopust. When the tape was completed, Detective Melton advised the appellant of his *Miranda* rights and inquired whether he was willing to waive these rights voluntarily and answer questions. Appellant responded: "I may have a lawyer if I knew what its all about." The detective explained that Gilliam, the alleged accomplice, had informed police that Emery was the one who had assaulted Mr. Buras and murdered Mrs. Coderre, whereupon appellant indicated he desired a lawyer. The interview terminated immediately, approximately three minutes after it had commenced.

At 10:52 p. m., 42 minutes later, the tape recorder was again turned on and Detective Melton recorded the following explanation:

"Mr. EMERY has been previously advised of his rights per the *Miranda* Ruling and stated that at this time he thought he should talk to a lawyer. Mr. EMERY was advised that Mr. GILLIAM, his friend, had told us that Mr. EMERY was the man that actually killed Mrs. CODERRE and also did the beating of Mr. BURAS in Dolan Springs on the night of the 14th. After hearing this, Mr. EMERY now decides that he does not wish a lawyer present for he does not think that he should have to handle the whole thing by himself. Consequently, this taped interview."

The defendant was informed of his *Miranda* rights a second time and the following dialogue occurred:

Q: ... Do you understand these rights?

A: Yes, I do.

Q: Do you wish at this time to answer our questions?

A: (Indication)

Q: ... Okay, before we started this tape has there been any threat made to you by either Sergeant NELSON or myself?

A: No.

Q: Is there anyone else in the room besides the three of us?

A: No, there is not.

Q: Have we made you any promises?

A: No, you haven't.

Q: Have we made any deals of leniency?

A: No, you haven't.

Q: Have either of us tried in any way to coerce you?

A: No, you haven't.

Q: Are you waiving your rights of your own free will?

A: Yes, I am.

During the suppression hearing, Detective Melton testified that the second interview took place at the defendant's request because he did not want "to carry the weight of the whole charge on himself."

The defendant stated that he overheard a "conversation" carried on by the two detectives in which they spoke about the gas chamber, and Emery felt the death penalty would be imposed if he did not confess.

"... Officer Nelson and Officer Melton were talking, not to me, but back and forth to themselves, and saying that it was too bad that I was going to take the rap for Gilliam, and that I would end up in the gas chamber. And that was when I decided to make a statement, because I was afraid of going to the gas chamber for a murder I didn't commit."

However, when Detective Melton was asked at the suppression hearing:

"Isn't it true that you and Sergeant Nelson had some conversation between the two of you, that is between Nelson and yourself, concerning the death penalty and the possibility of Emery's conviction in which Emery was present, and overheard these conversations?"

he responded: "Not that I recall." Relying on the testimony adduced during the hearing, the trial judge denied the defendant's motion to suppress the statement made to the officers. This statement was subsequently used at defendant's trial for first degree murder and second degree burglary. In addition, the trial judge, pursuant to the plea agreement, relied in part on appellant's confession in finding him guilty of aggravated assault and armed robbery.

█ There is no question in this case that appellant expressed his desire to have an attorney. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966), provides that if the defendant indicates in any manner that he wishes to remain silent, interrogation must stop immediately. Moreover, if the defendant indicates in any manner that he wishes to consult with an attorney before speaking, interrogation must cease until an attorney is present. *Id.* at 474, 86 S.Ct. at 1628. "[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege ..." *Id.* at 469, 86 S.Ct. at 1625. In fact, once an accused has requested counsel, the police

may not interrogate him unless he initiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Under Arizona law, statements or confessions by an accused are prima facie involuntary and the state has the burden of proving the voluntariness of such statements. *State v. Edwards*, 111 Ariz. 357, 360–61, 529 P.2d 1174, 1177–78 (1974). *State v. Holden*, 88 Ariz. 43, 352 P.2d 705 (1960).

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court explained the difference between the procedural safeguards triggered by an assertion of the right to remain silent and by a request for an attorney. " '[I]nterrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.' " *Id.* at 104, n. 10, 96 S.Ct. at 326, n. 10. *Miranda v. Arizona*, 384 U.S. at 474, 86 S.Ct. at 1628. Thus, "[a]n accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 422 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979).

■ In the context of *Miranda*, the infringement of an individual's fifth-amendment rights necessarily devolves from finding a continuation of interrogation. Since the appellant maintains that he was interrogated in violation of the standards set forth in *Miranda* after he had invoked his fifth-amendment right to silence and his sixth-amendment right to assistance of counsel,[1] we must study the record to determine whether interrogation actually occurred.

The term "interrogation" as employed in the *Miranda* decision

"refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating re-

sponse from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 299–303, 100 S.Ct. 1682, 1689–90 (1980).

The state maintains that appellant's *Miranda* rights were not violated because the police were merely presenting the evidence available against appellant and such action does not constitute interrogation. However, any response to this argument hinges on the *Innis* definition of interrogation which necessitates a two-prong analysis: (1) was there express questioning of the defendant; if not, (2) did police officers engage in activities which they should have known were reasonably likely to elicit an incriminating response? The facts are undisputed that once appellant invoked his *Miranda* rights, express questioning ceased. Nevertheless, under the facts and circumstances of this case as set forth below, we find that the actions of the detectives amounted to the functional equivalent of interrogation.

■ The state alternatively argues that *Innis* is not applicable to the facts of the present case because appellant voluntarily initiated the conversation with Detective

1. Because we rely upon appellant's fifth-amendment right to remain silent and his fifth-amendment right to have counsel present during questioning in deciding this case, we need

not reach the merits of appellant's claim that he was denied the right to counsel afforded by the sixth and fourteenth amendments.

Melton and Sergeant Nelson and, therefore, waived his rights. It is true that an accused, after having been advised of his *Miranda* rights, can waive his rights and respond to interrogation by the authorities. *See North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). However, the assertion of a waiver of rights in the instant case is premised upon appellant's own statements at the start of the second interview that he was not coerced in any way and that his statements were voluntary. The United States Supreme Court in *Haynes v. Washington*, 373 U.S. 503, 512–13, 83 S.Ct. 1336, 1342–43, 10 L.Ed.2d 513 (1963), addressed this type of argument when it stated:

"[S]ubstantial doubt [exists] as to the probative effect to be accorded recitations in the challenged confession that it was not involuntarily induced. (citation omitted). It would be anomalous indeed, if such a statement, contained within the very document asserted to have been obtained by use of impermissible coercive pressures, was itself enough to create an evidentiary conflict precluding this Court's effective review of the constitutional issue. Common sense dictates the conclusion that if the authorities were successful in compelling the totally incriminating confession of guilt, the very issue for determination, they would have little, if any, trouble securing the self-contained concession of voluntariness. Certainly, we cannot accord any conclusive import to such an admission ..."

Detective Robert Melton, Sergeant Jack E. Nelson, and the defendant, Robert Lloyd Emery, testified at the suppression hearing on December 19 and 20, 1979. Melton and Nelson are the two officers who questioned Emery in the detectives' office approximately seven hours after his arrest on December 16, 1978.

Sergeant Nelson testified on direct examination that the second interview was initiated at Emery's request. When asked whether anything transpired between the time the first interview ceased and the second interview began, Nelson responded:

"Conversation between Detective Melton and myself and questions by Emery."

On direct examination Detective Melton testified that after Emery invoked his *Miranda* rights and the first interview terminated, he was advised that his alleged accomplice, Gilliam, had informed the police that Emery had killed Mrs. Coderre and beaten Mr. Buras. Emery then decided to waive his rights and talk because he did not want to carry the whole weight of the charge on himself. The following dialogue between defense counsel and witness Melton ensued:

. . . .

Q: (BY DEFENSE COUNSEL) You did inform Mr. Emery while the tape recording was shut off, and during the 40 or 45 minute period, if Emery was convicted, the death penalty was a distinct possibility, didn't you?

A: I don't honestly recall. As a matter of fact, I don't think it came out quite that way.

Q: Well, didn't you use the words "gas chamber" instead of death penalty?

A: I don't recall.

Q: Is it possible that you used the words gas chamber?

. . . .

A: It would be possible.

. . . .

Q: There was one conversation concerning the death penalty between you and Mr. Emery; is that what you are telling us?

A: No, sir, as a matter of fact I think Sergeant Nelson and Mr. Emery, but I couldn't be sure of it.

Q: Well, did you ever talk with Emery about the death penalty?

A: I don't recall, but I don't believe I did.

Q: But isn't it possible?

A: I was present when it was discussed.

Q: Is it possible that you talked with Emery about the death penalty, and you have forgotten it here today?

A: Yes it is.

Q: Okay, but you were present during the conversation between Nelson and Emery in which the death penalty was discussed.

A: Yes, one of us answered him.

Q: Is it possible that you talked with Emery about the death penalty, and you have forgotten it here today?

A: Yes, it is.

Q: Okay, but you were present during the conversation between Nelson and Emery in which the death penalty was discussed; is that what you are telling us?

A: Yes, one of us answered him.

Q: Okay, it wasn't until after the subject of the death penalty was discussed that he decided that he would talk with you; isn't that true?

A: Yes, more or less.

Q: Isn't it true that you and Sergeant Nelson had some conversations between the two of you, that is between Nelson and yourself, concerning the death penalty in the possibility of Emery's conviction in which Emery was present, and overheard those conversations?

A: Not that I recall.

Q: Did you have any conversations then with Mr. Nelson, with Sergeant Nelson, there in the room where the defendant was being interviewed in which the defendant overheard?

A: Any conversation we had, he would have overheard them.

Q: I'm talking about conversations that took place while you had turned off the tape recorder.

A: Yes, any conversation that we would have had in that room, he would have overheard.

. . . .

Q: Officer Melton, once you began talking with the defendant Emery again, why didn't you just turn on the tape recorder?

A: We did.

Q: 45 minutes later?

A: That's when we started talking to him.

Q: But you talked with him before that? You just told us that you did; didn't you?

A: Oh, yes. This was not an interview, or per se an interview type of conversation with him. There were no questions asked of him that were relevant to the case.

Q: One of the officers present, either you or Sergeant Nelson, said in the presence of the defendant while the tape recorder was turned off, well, "It's a shame that Bob is going to take the rap for Gilliam"; is that true?

A: I don't think so.

On redirect examination by the prosecution, Melton testified that prior to the time when the conversations about the death penalty or gas chamber occurred, neither he nor Sergeant Nelson had threatened Emery with the death penalty if he did not confess. The conversation began because "Mr. Emery asked the question if there was a death penalty in this State, words to that effect." This statement, however, is refuted by the defendant.

During the cross-examination of Sergeant Nelson by defense counsel, the following conversation occurred:

Q: Okay, but you do admit that there were discussions between Melton and you concerning the death penalty, correct?

A: I said it's a probability we discussed it.

Q: Then weren't—those discussions, those comments, weren't directed, in your opinion, at either Emery or Gilliam but there was a possibility of discussion, correct?

A: Well, Emery was the only one there at the time, and there was no point in directing these statements to him, if in fact these statements were made.

Q: But it's probable, though, that those statements were made; isn't it?

A: Yes, because we had been investigating a capital crime, and we were discussing the final elements of the investigation, and we could have, yes.

Q: And you were aware, were you not, that Officer Melton had brought up the subject of a death penalty, and gas chambers in his earlier conversations with Gilliam?

A: Definitely, definitely.

Q: And it concerned you?

Appellant's testimony at the suppression hearing unequivocally indicates that the officers commenced the discussion about the gas chamber. Moreover, Emery's confession was premised upon the misconception that "coercion" included only physical abuse.

A: (BY DEFENDANT) They read me my rights anyway back—after this Masopust tape was on, and everything, and they told me—explained what it was about. They turned on the tape recorder, and told me what it was before, and asked me if I wanted to talk to them. And I said, "No, I don't want to talk to you. I want to see a lawyer. I had never been in this kind of a situation before."

. . . .

And then they shut the tape off.

And then they took out a new tape and read me my *Miranda* Rights or whatever, and told me I had the right to have an attorney, and all that, and asked me if I wanted to make a statement.

And I said, "No, I wanted a lawyer present because I never had been in this kind of a situation before."

And they shut the tape recorder off, and like I say, while Melton was a little disgusted, and he just threw the recorder across the table.

. . . .

Q: At that point in time, did Detective Melton and Detective Nelson go to their respective desks and start working?

A: No. Detective Nelson—the three of us were all sitting about as close as the court stenographer, me and Bob Melton right here (indicating), and then after I told him that I wanted to speak to a lawyer, and he shut the tape recorder off, the two of them started talking again, talking to me and telling me that Gilliam had made a confession, taken a polygraph test, and everything else, and asked me again if I wanted to make a statement.

And I said, "No". And then Bob Melton made the statement that it is too bad if I was going to take the rap for Gilliam, and they already talked about the gas chamber there while all this was going on, not directly to me, but between Bob Melton and Nelson.

Q: At no time did you ask whether the State of Arizona had the death penalty?

A: They asked me if I knew that the State of Arizona had.

Q: You did not ask them?

A: No.

. . . .

Q: Did they make the statement, and let's be more specific. Did they make the exact statement that you should tell them the truth or you would be left—did they make the exact statement that you should tell them the truth or you would be left holding the bag or taking the rap?

A: I told them that I would tell the truth and that I most certainly did want to take the polygraph test, and it was never given to me.

Q: I guess—I take it now from your testimony that you were saying that they threatened you with the death penalty if you didn't confess; is that correct?

A: That is the way I felt, yes.

. . . .

Q: Isn't it true that the reason you gave the statement—the second statement to Detectives Melton and Nelson was because you didn't want to be left taking the rap for something you didn't do?

A: The understanding that I had, they had already—Melton told me that they had enough evidence to put me in the gas chamber.

Q: He specifically told you that?

A: Not to me—between Nelson and Melton.

Q: So, you are saying that you didn't give that statement in order to save yourself?

A: Yes, I did give the statement to save myself. I said I would be getting the gas chamber for murder I didn't commit.

. . . .

Although testimony regarding who posed the first question on the death penalty conflicts, it is crucial that the officers were not unequivocally able to say that they had not discussed the gas chamber or the death penalty in Emery's presence. "No legal alchemy can transmute such wholly equivocal testimony into a denial or refutation of the petitioner's specific recitation of facts." *Haynes v. Washington*, 373 U.S. 503, 510, 83 S.Ct. 1336, 1341, 10 L.Ed.2d 513 (1963). It is uncontroverted in the record of the suppression hearing that in appellant's presence the officers discussed the death penalty as being appellant's fate. This conversation occurred during the 42-minute interval *after* appellant had invoked his right to counsel.

Even if, as asserted by Detective Melton, the conversation regarding the gas chamber was initiated by appellant, the absence of any recording of these events is truly remarkable and too convenient for the state's case. The state has not met its burden of proving the voluntariness of defendant's statements. *State v. Edwards*, 111 Ariz. 357, 360–61, 529 P.2d 1174, 1177–78 (1974); *State v. Holden*, 88 Ariz. 43, 49, 352 P.2d 705, 710 (1960). Our review of the record indicates that appellant did not initiate the second conversation and his statement, obtained after he invoked his right to counsel, resulted from the functional equivalent of interrogation. Appellant cannot be said to have waived his right to have counsel present.

The United States Supreme Court has emphasized "[t]hat it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Appellant's right under the fifth and fourteenth amendments to have counsel present at any custodial interrogation, as set forth in *Miranda*, was violated when, on December 16, 1978, he was subjected to interrogation as this concept is defined in *Innis*.

## ADMISSIBILITY OF CONFESSION

■ Appellant argues that his confession should have been suppressed because it was given involuntarily. The state counters that although appellant asserted his right to counsel, he intentionally abandoned it. Despite appellant's express statement, we refused to recognize a waiver because appellant was subjected to the functional equivalent of interrogation after he had asserted his fifth-amendment right to the presence of counsel. Thus, prior cases holding that the answering of questions after the giving of a proper *Miranda* warning constitutes waiver by conduct, although of continuing validity, are inapposite here. *State v. Pineda*, 110 Ariz. 342, 519 P.2d 41 (1974); *State ex rel. Berger v. Superior Court*, 109 Ariz. 506, 513 P.2d 935 (1973), *cert. denied sub nom. Pate v. Arizona*, 414 U.S. 1145, 94 S.Ct. 899, 39 L.Ed.2d 101 (1974). *See also North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). (No per se rule exists for waiver; it must be determined from the particular facts and circumstances of the case).

■ Considering all the circumstances of a particular case, a court can find a confession involuntary if it determines the existence of one of the following factors: (1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement. *State v. Gretzler*, 126 Ariz. 60, 82, 612 P.2d 1023, 1045 (1980); *State v. Steelman*, 120 Ariz. 301, 309, 585 P.2d 1213, 1221 (1978). We reemphasize that the conversation between the detectives regarding the gas chamber which occurred in appellant's presence during the 42-minute interval after he had asserted his right to counsel amounted to actions which the officers

"*should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis, supra.* Such actions can only be viewed as "impermissible conduct by police." The existence of this factor mandates a finding of involuntariness. Any part of the confession obtained after the appellant invoked his fifth-amendment right to counsel is therefore inadmissible.

Because appellant's inadmissible statement was used at trial, we reverse the convictions of first degree murder and second degree burglary. We likewise reverse the convictions of aggravated assault and armed robbery because the trial judge, pursuant to the plea agreement, relied on the confession in determining appellant's guilt.

ADMISSIBILITY OF PRIOR INCONSISTENT STATEMENT

Gilliam, the appellant's alleged accomplice, appeared as a prosecution witness and was questioned by the attorney for the state:

Q: (By state attorney) Did you see Bob Emery stab the old lady?

A: No, I did not.

Q: Did you stab the old lady?

A: I don't think so.

Q: You don't know?

A: To be truthful, no I don't.

Q: How is it that you don't know?

A: I just don't because, like I said, there were times that I was in the house that I was out of it.

The prosecution did not question Gilliam about his prior inconsistent statements made on the day of his arrest during an interview with Detective Melton. Upon conclusion of the witness' testimony, counsel for the defendant reserved cross-examination of the witness, and ultimately waived it.

After the direct examination of its witness, Gilliam, the state called Detective Melton as a prosecution witness, and the following dialogue occurred.

Q: Turning to last week—I believe that would have been February 16, Friday—would you have occasion to interview Mr. Gilliam down in jail?

A: Yes.

. . . .

Q: And during that interview, did Mr. Gilliam state, or made a statement that he saw Mr. Emery stab the old lady?

Defense counsel immediately objected to the admission of this evidence and moved for a mistrial. The objections were overruled, and the state continued:

Q: On February 16, 1978, did Mr. Gilliam state to you that he saw Mr. Robert Lloyd Emery stab the victim?

A: Yes, he did.

The trial court admonished the jury that this statement could be used only for impeaching Mr. Gilliam's testimony. However, later, near the end of the trial and before formal instructions were given to the jury, the court retracted its prior admonishment and explained to the jury that it could give the statement whatever weight and consideration it desired.

In chambers, immediately following the testimony of Detective Melton, counsel for the defendant renewed his objections and again requested a mistrial. The state, in reply to these motions, explained its actions:

"The State's motive in having that testimony presented before the Court was to impeach his [sic] own witness, Mr. Gilliam. The State was aware from Mr. Martin's prior trial tactics that there was a good possibility he would not call Mr. Gilliam on his reserved cross-examination, that the State would be precluded from impeaching its own witness."

The state, however, was not "precluded from impeaching its own witness." 17A A.R.S. Rules of Evidence, rule 607, provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." In *State v. Acree*, 121 Ariz. 94, 96, 588 P.2d 836, 838 (1978), we noted that rule 607 eliminated the need to prove damage or prejudice before a party could impeach its own witness. Thus, had the state so desired, it could have impeached Gilliam during direct examination of the witness.

■ Moreover, 17A A.R.S. Rules of Evidence, rule 613(b), requires that extrinsic evidence of a prior inconsistent statement not be admissible unless the witness is afforded an opportunity to explain or deny the statement. Rule 613(b) provides:

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

Appellant maintains that the statement made by Detective Melton about Gilliam's confession was inadmissible under rule 613(b) because Gilliam was not afforded the opportunity to explain or deny any of his alleged inconsistent statements.

Rule 613 as adopted in Arizona is identical to federal rule 613. Cases interpreting federal rule 613(b) have permitted impeachment testimony without the prior laying of foundation as long as the witness was given the opportunity to explain. *United States v. Praetorius*, 622 F.2d 1054 (2nd Cir. 1979), *cert. denied sub nom. Lebel v. United States*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *United States v. Bibbs*, 564 F.2d 1165 (5th Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); *Strudl v. American Family Mutual Insurance Co.*, 536 F.2d 242 (8th Cir. 1976); *United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976). *See also State v. Acree*, 121 Ariz. 94, 588 P.2d 836 (1978). These cases are consistent with the Advisory Committee's Note on rule 613(b) which states:

"The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine on the statement, with no specification of any particular time or sequence."

K. Redden & S. Saltzburg, Federal Rules of Evidence Manual, 213 (1975).

■ In light of this explanatory note, we interpret rule 613(b) to set forth two separate requirements: (1) that the witness be allowed to explain; and (2) that the opposite party be permitted to interrogate him. Either or both of these requirements can be dispensed with only if "justice so requires." Various commentators have stated that rule 613(b) does not by its wording require the party which introduces evidence of an inconsistent statement to provide the witness with an opportunity to explain as long as the witness does eventually receive this opportunity. However, minimum compliance with the rule requires that the party which intends to introduce an impeaching statement inform the court so that the opposing party may keep the witness available to explain. J. Weinstein & M. Berger, *Weinstein's Evidence*, 613–24 (1981); Note, "Modification of the Foundation Requirement for Impeaching Witnesses: *California Evidence Code Section 770*," 18 Hastings L.J. 210, 220 (1966); *Chadbourn, A Study of the Witnesses Article of the Uniform Rule of Evidence, Cal. Law Revision Comm'n Reports, Recommendations & Studies* 725, 750–51 (1964).

In the instant case, rule 613(b) does not bar the prosecution from introducing a prior inconsistent statement of its own witness even though it does not give that witness the chance to explain. In so doing, however, the prosecution takes the risk that the opposing party will choose not to cross-examine the witness since we have previously stated that the opposing party cannot be forced to provide the witness with an opportunity to explain. Since the witness never received an opportunity to explain, Gilliam's prior inconsistent statement was inadmissible.

## TIMELINESS OF PRESENTATION BEFORE MAGISTRATE

On the afternoon of December 16, 1978, appellant was arrested in the parking lot of a liquor store. He was transported to the Mohave County Jail, booked, and placed in a padded isolation cell. Appellant's initial appearance before a magistrate took place the following morning: 19 hours after the

arrest. Appellant maintains that failure to bring him promptly before a magistrate resulted in a denial of a "substantial right."[2]

Arizona has defined by statute the duty of an officer making an arrest with a warrant. A.R.S. § 13–3897 requires that the person arrested be taken without unnecessary delay before the magistrate who issued the warrant. In addition, at the time of appellant's arrest, 17 A.R.S. Rules of Criminal Procedure, rule 4.1(c),[3] provided:

"A person arrested shall be taken before a magistrate without unnecessary delay. If he is not brought before a magistrate within 24 hours after arrest, he shall immediately be released."

This rule defines the applicable standard of timeliness as "without unreasonable delay," but in no event more than 24 hours after arrest. "There is no requirement that the person arrested be taken immediately before a magistrate." *State v. Mahoney*, 25 Ariz.App. 217, 218–19, 542 P.2d 410, 411–12 (1975).

In the instant case, although the provisions of rule 4.1(c) were met, we found appellant's statements inadmissible due to a violation of his fifth-amendment right to have counsel present during custodial interrogation. Therefore, we need not resolve the issue whether appellant's statements were obtained as a result of a failure promptly to bring him before a magistrate.

## VALIDITY OF ARREST WARRANT

During a hearing in which the sufficiency of the arrest warrant was challenged, the magistrate who issued the warrant described the information on which he based his finding of probable cause. The victim of the aggravated assault, Mr. Buras, described both of his assailants to Detective Cisney, and positively identified Edward Gilliam, the appellant's alleged accomplice, from a photograph. Detective Cisney told the magistrate that Deputy Sheriff Sabo had observed Gilliam with another individual at a local bar before and after the aggravated assault incident. The two men "seemed to be running together." Moreover, the descriptions of Gilliam and his companion matched closely the descriptions provided by the victim. Based on this information and on additional questions asked of Detective Cisney, the magistrate connected Emery's name with the description of the second individual and determined that probable cause existed for his arrest.

Appellant maintains that the evidence presented to the magistrate by police detective Cisney was too vague to support a finding of probable cause that the appellant had committed a crime. However, "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969) (search without a warrant); *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964) (arrest without a warrant). "In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) (search without a warrant). In Arizona,

---

**2.** In support of the proposition that failure promptly to bring an arrested person before a magistrate amounts to an unwarranted detention, and any confession made during that time is inadmissible, appellant cites three United States Supreme Court cases: *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *Upshaw v. United States*, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). However, the admissibility of the confessions in these cases rested on an interpretation of Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., or its equivalent. These decisions did not involve an analysis of a constitutional issue; they were limited to an interpretation of the rules of evidence applicable in *federal* criminal prosecutions. Therefore, the rule of law delineated in these decisions regarding the exclusion of confessions resulting from unwarranted detentions is not binding on the states. *See Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

**3.** Now 17 A.R.S. Rules of Criminal Procedure, rule 4.1(a).

probable cause has been defined as "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a *strong* suspicion of guilt." *In re Dodd v. Boies,* 88 Ariz. 401, 404, 357 P.2d 144, 146 (1960); *Davis v. Superior Court,* 175 Cal.App.2d 8, 22–23, 345 P.2d 513, 522 (1959). We find a description by the victim of his assailant which fits that of the accused to support a "strong suspicion of guilt." A reasonable and prudent man would not find the facts presented to the magistrate too vague to support a probability of criminal activity.

 The requirements of the fourth amendment demand the presentation to a magistrate of information sufficient to substantiate an independent finding of probable cause before an arrest or search warrant can issue. *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1530 (1958); *see State v. Currier,* 86 Ariz. 394, 347 P.2d 29 (1959). The information presented to the magistrate showed that the victim positively identified one of his assailants, and described the second assailant. The victim's description of the appellant matched that given by a detective who had seen him in the company of the alleged accomplice on the night of the aggravated assault upon Mr. Buras. The magistrate was supplied with sufficient information to make an independent determination of probable cause. We find that the appellant was arrested pursuant to a valid warrant.

## GRAND JURY BIAS

 The same grand jury which indicted appellant and his codefendant, Edward Gilliam, for the crimes of aggravated assault, arson, armed robbery, and attempted murder on December 20, 1978, handed down a second indictment for burglary in the second degree and first degree murder later the same day. Appellant contends the close proximity of the second grand jury proceeding to the first proceeding on unrelated charges caused the grand jury to be biased, and, thus, denied him due process of law. We cannot agree.

 If a state resorts to the grand jury procedure, the due process and equal protection clauses of the fourteenth amendment require utilization of an unbiased grand jury and the presentation of evidence in a fair and impartial manner. *Corbin v. Broadman,* 6 Ariz.App. 436, 433 P.2d 289 (1967); *see State v. Superior Court In and For the County of Pima,* 102 Ariz. 388, 430 P.2d 408 (1967). Bias in a juror is predicated upon "[w]hether the existence of a state of mind on the part of the juror is such as will prevent him from acting with entire impartiality . . ." *State v. Salazar,* 27 Ariz. App. 620, 624, 557 P.2d 552, 556 (1976). There is no bias if the juror can base his decision solely on the evidence presented and the law. *State v. Gretzler,* 126 Ariz. 60, 612 P.2d 1023 (1980). A finding of partiality or impartiality is a matter within the discretion of the trial court, and such a finding is not subject to review by an appellate court unless clearly erroneous. 27 Ariz. App. at 624, 557 P.2d at 556; *Priestly v. State,* 19 Ariz. 371, 374, 171 P. 137, 138 (1918).

Appellant maintains that it was impossible for the grand jury to purge itself of the prejudicial taint of evidence presented to it in connection with the first indictment before handing down the second indictment. He notes that four grand jurors asked to be dismissed upon commencement of the second proceeding because they did not believe they could be unbiased. However, the record of the second grand jury proceeding clearly reveals that each juror was questioned whether he or she could "delineate and segregate and keep separate" the prior testimony regarding the Buras assault incident from the testimony to be heard. Eleven jurors unequivocally indicated they would be able to separate the prior testimony. Four jurors stated they would be unable to consider the incidents separately. All four jurors were immediately excused. The record of the grand jury proceeding is devoid of any perceptible bias.

Moreover, we do not find that a grand juror's knowledge of a defendant's prior acts necessarily implies bias so as to deny the defendant due process of law. This finding is consistent with a statement by the United States Supreme Court distinguishing "between mere familiarity with a petitioner or his past and an actual predisposition against him . . . *Murphy v. Florida*, 421 U.S. 794, 800 n. 4, 95 S.Ct. 2031, 2036 n. 4, 44 L.Ed.2d 589 (1975). In fact, the United States Supreme Court has stated:

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (citations omitted)."

*Irvin v. Dowd*, 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–43, 16 L.Ed.2d 751 (1961). Although these cases deal with jury trials, and not with grand jury proceedings, we believe the standard for ascertaining bias in grand jury proceedings does not exceed the standard employed in jury trials.

The mere existence of a juror's assertion of his ability to be impartial is, admittedly, not dispositive of the issue if the defendant can demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of impartiality." *Murphy v. Florida*, 421 U.S. at 800, 95 S.Ct. at 2036; *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643. Appellant, however, has not shown the existence of bias in the minds of the grand jury members which would substantiate quashing the indictment.

Because appellant was denied his fifth-amendment right to have counsel present during interrogation, the conviction and sentence of death as well as the convictions and sentences of aggravated assault and armed robbery are reversed. All causes are remanded for proceedings consistent with this opinion.

HOLOHAN, C. J., GORDON, V. C. J., and CAMERON and FELDMAN, JJ., concur.