NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

GEORGE BRIAN AZAR, *Appellant*.

No. 1 CA-CR 16-0177
FILED 4-25-2017

Appeal from the Superior Court in Coconino County
No. S0300CR201400297
The Honorable Jacqueline Hatch, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jillian Francis
*Counsel for Appellee*

Coconino County Public Defender's Office, Flagstaff
By Brad Bransky
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Patricia K. Norris joined.

**M c M U R D I E**, Judge:

**¶1**　　　George Brian Azar appeals his convictions and sentences for second-degree murder, misconduct involving weapons, and possession of marijuana. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND[1]

**¶2**　　　In early 2014, Azar and the victim were coworkers and friends. At the time, the victim was grappling with some financial difficulties, and he approached Azar for help. In March 2014, Azar loaned the victim $400. The parties agreed that the loan would be repaid by April, 2014, and that the victim could satisfy his obligation under the loan by completing several home improvements and repairs for Azar.

**¶3**　　　Initially, the victim performed work at Azar's house as agreed, but he then began failing to show up for work as scheduled. Believing he was being disrespected and "blown off," Azar became very upset with the victim.

**¶4**　　　On the morning of April 17, 2014, Azar's anger grew after he viewed an online posting by the victim's wife, thanking the victim for buying her a pair of designer shoes. That evening, after returning home from work, Azar drove to the victim's house to confront him. Azar sent a text message to the victim and waited in his vehicle for some time for the victim to come out and meet him. However, the victim did not come out of his house so eventually Azar returned home.

**¶5**　　　Shortly after Azar drove home, the victim arrived at Azar's house. Azar's wife greeted Azar and the victim at the door, and then went to her bedroom, in the back of the house, to get ready for bed. While changing into her pajamas, Azar's wife heard Azar speaking with a "raised" voice and then heard a "pop." Alarmed by the sound, she rushed

---

[1]　　　We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

into the living room and saw the victim sitting "slumped" on the couch with his eyes closed. She noticed that he had a hole in his forehead and realized that he had been shot.

¶6            Panicked, Azar's wife began looking for a phone to call 9-1-1. Unable to locate a phone, she ran outside to contact a neighbor, and Azar followed her outside and handed her a phone. While Azar's wife continued speaking with the 9-1-1 operator, Azar reentered the house. After unlocking his safe, emptying the gun he left on the living room coffee table, and removing the victim's hat, Azar sent a test message to his employer: "Just shot [the victim] in for[e]head . . . not working [tomorrow]."

¶7            When the responding police officers arrived at the Azar residence, they immediately placed Azar in handcuffs and took him into custody. The officers then swept and secured the premises, allowing emergency medical personnel to enter and attend to the victim, who had labored breathing. The medical responders transported the victim to the hospital, but the on-call neurosurgeon examined the victim and determined he had no neurological activity. The victim died shortly thereafter.

¶8            Meanwhile, officers transported Azar to a police station where a detective waited to execute a physical characteristic warrant. While the detective collected Azar's fingerprints, nails, hair, and DNA, Azar made several spontaneous statements: (1) "I'll probably never see daylight again," (2) "That'll probably be the last chew I ever get" (said while removing chewing tobacco from his mouth so the detective could swab his cheek), and (3) "They're going to hang [me]."

¶9            Later that evening, officers executed a search warrant on Azar's home and seized seven guns and 1.13 pounds of marijuana. The officers who photographed and documented the home found no evidence of a struggle.

¶10           The State charged Azar with one count of first-degree murder (Count 1), seven counts of misconduct involving weapons – prohibited possessor (Counts 2-8), and one count of possession of marijuana for sale (Count 9).[2] The State also alleged several aggravating factors.

¶11           At trial, the medical examiner who performed the autopsy on the victim opined that the victim died from the gunshot wound to his forehead, and testified that the victim had no other visible injuries other

_____

[2]        At trial, the State moved to amend Count 9 to possession of marijuana, which the superior court granted.

than a small, healing abrasion on his foot. The toxicology results from the autopsy revealed that the victim had ingested both methamphetamine (423 nanograms per milliliter) and marijuana (6.5 nanograms per milliliter) before his death.

¶12    The criminalist who tested the gun Azar used to shoot the victim testified that the weapon was in good working condition and there was no malfunction with the trigger. Based on his examination of the victim's hat, the criminalist also concluded that the gun was fired "at or near contact" with the hat.

¶13    Taking the stand in his own defense, Azar testified that he never intended to kill the victim. He claimed that on the night in question, the victim appeared "aggressive" and demanded more money. When Azar refused, the victim became angry and threatened to approach Azar's wife for money if he could not obtain it from Azar directly. Once the victim mentioned Azar's wife, Azar retrieved a gun from his coffee table and ordered the victim to leave. Rather than comply, the victim grabbed for the gun and the weapon discharged as the men struggled for possession, with Azar's finger on the trigger.

¶14    While testifying, Azar admitted that he had: (1) previously been convicted of a felony, (2) never had his right to possess a firearm restored, (3) possessed seven firearms on April 17, 2014, and (4) possessed marijuana on April 17, 2014. He also acknowledged that, immediately after the shooting, he told his wife that he was going to jail for the rest of his life.

¶15    After an eight-day trial, the jury found Azar guilty of all counts of misconduct involving weapons, the amended charge of possession of marijuana, and the lesser-included offense of second-degree murder. The jury also found one aggravating circumstance, emotional harm to the victim's family. After weighing the aggravating and mitigating factors, the superior court sentenced Azar to an aggravated term of twenty years' imprisonment on Count 1, a consecutive, presumptive term of two-and-one-half years' imprisonment on Count 2, concurrent, presumptive terms of two and one-half years' imprisonment on Counts 3-8, and a concurrent, presumptive term of one year' imprisonment on Count 9. Azar timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).[3]

---

[3]    Absent material revision after the date of an alleged offense, we cite a statute's or rule's current version.

**DISCUSSION**

**A.      Preclusion of Methamphetamine Pipe.**

¶16      Azar argues the superior court improperly precluded evidence of a methamphetamine pipe that medical personnel discovered on the victim's person while examining his body after the shooting.

¶17      Before trial, the State moved in limine to preclude any evidence of "the glass pipe [found] lodged in between the victim's buttocks." Acknowledging the residue within the pipe later tested positive for methamphetamine, the State argued the pipe was irrelevant and cumulative to a toxicology report that demonstrated the victim had a substantial level of methamphetamine in his system at the time of his death. After a hearing on the motion, the superior court found that the pipe was irrelevant and the toxicology report, not the pipe, reflected the victim's methamphetamine use the evening of the shooting.

¶18      We review a trial court's evidentiary ruling for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006). "Absent a clear abuse of discretion, we will not second-guess a trial court's ruling on the admissibility or relevance of evidence." *State v. Rodriguez*, 186 Ariz. 240, 250 (1996).

¶19      In general, relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Evidence is relevant if it has "any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Ariz. R. Evid. 401. Relevant evidence may be excluded, however, if its probative value "is substantially outweighed" by a danger of unfair prejudice. Ariz. R. Evid. 403.

¶20      At trial, Azar admitted he brandished the gun and pulled the trigger, causing the victim's death. He argued instead that he lacked the *mens rea* for murder, and asserted the shooting was either an accident or an act of self-defense. Therefore, the limited issues before the jury were whether Azar: (1) acted intentionally, knowingly, or recklessly when he caused the victim's death; and (2) reasonably believed that physical force was immediately necessary to protect himself against the victim's use or attempted use of unlawful deadly physical force. *See* A.R.S. §§ 13-1105(A)(1) (defining first-degree murder as causing the death of another person with premeditation, "intending or knowing that the . . . conduct will cause death"); 13-1104(A)(3) (defining second-degree murder as causing

the death of another person intentionally, knowingly, or "[u]nder circumstances manifesting extreme indifference to human life"); 13-404(A) (setting forth the parameters of self-defense: "a person is justified in threatening or using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force"); 13-405(A)(2) ("a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force").

¶21        Claiming that both the existence and location of the methamphetamine pipe were essential to his theory of self-defense, Azar argues the precluded evidence demonstrated that the victim: (1) ingested methamphetamine "immediately prior to the altercation," (2) was "desperate for money" to support a drug habit, and (3) was "actively concealing" his drug use from his family and friends. Applying Rule 401 to these facts, whether the victim carried a methamphetamine pipe on his person at the time of the shooting was not a fact of consequence for the jury to consider in determining whether Azar was culpable for the victim's death. Stated differently, the presence of the pipe—a fact not known to Azar until well after the shooting had occurred—did not make it more or less probable that Azar intentionally, knowingly, or recklessly shot the victim. Likewise, the presence of the pipe did not make it more or less probable that the victim used or attempted to use unlawful deadly physical force against Azar. Furthermore, regarding the location of the pipe, Azar admitted at trial there was no reason to tell the jury the location of the pipe, because it would be "overly prejudicial." Accordingly, the superior court did not abuse its discretion in precluding the evidence of the methamphetamine pipe.

## B.      Admission of Prior Inconsistent Statements.

¶22        Azar contends the superior court improperly admitted evidence of his wife's prior inconsistent statements through the testimony of one of the investigating detectives. Specifically, he argues these prior statements were inadmissible because the State never questioned his wife about them at trial. We review a trial court's evidentiary ruling for an abuse of discretion. *Ellison*, 213 Ariz. at 129, ¶ 42.

¶23        On the second day of trial, the State called Azar's wife to testify. During cross-examination, defense counsel elicited testimony that the Azars were "financially stable" and Azar had the means to make loans

to several people. On redirect, the prosecutor did not challenge Azar's wife regarding this portion of her testimony or any prior statements she had made regarding the Azars' finances.

¶24        On the fifth day of trial, the prosecutor called one of the investigating detectives to the stand and elicited testimony that he had interviewed Azar's wife the night of the shooting, and then asked whether she had mentioned anything "about her finances." Defense counsel objected, arguing the testimony was hearsay and "an outside witness" could not be used to introduce another witness's prior inconsistent statements; rather, such prior inconsistent statements could only be introduced during the declarant's testimony. After hearing from counsel, the trial court determined that the prior inconsistent statements could be relayed by the investigating detective, and advised defense counsel that he was free to recall Azar's wife and question her directly regarding her prior statements if he so desired. The investigating detective then recounted some of the prior interview statements, which explained that Azar was prescribed several expensive medications and, as a result, the Azars' monthly expenses exceeded their income.

¶25        Azar argues that allowing the detective to testify regarding his wife's prior inconsistent statements was improper.[4] Extrinsic evidence, including testimony from another witness, regarding a witness's prior inconsistent statements is admissible "only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." Ariz. R. Evid. 613(b). While Rule 613 did not require the State to provide the witness with an opportunity to explain the inconsistent statement initially, it did require the witness to eventually have such an opportunity. *State v. Emery*, 131 Ariz. 493, 504 (1982). Furthermore, the rule required "the party which intends to introduce an impeaching statement [to] inform the court so that the opposing party may keep the witness available to explain." *Id.*

---

4        Azar contends that his wife was not subjected to impeachment during cross-examination at trial regarding the prior statements, as required under Rule 801(d)(1)(A), and evidence of the statements was therefore inadmissible. However, she was subject to cross-examination regarding her prior inconsistent statements, and the trial court properly permitted the investigating detective to recount those prior statements during his testimony. *See State v. Hernandez*, 232 Ariz. 313, 323, ¶ 47 (2013) ("A prior inconsistent statement by a witness subject to cross-examination is not hearsay.").

¶26        The State in this case failed to inform the court that they would be introducing extrinsic impeachment evidence of Azar's wife through the investigating detective. However, when the court gave Azar the opportunity to recall his wife as a witness, he did not do so, nor did he make an offer of proof that she was no longer available to be recalled. Accordingly, we review only for fundamental, prejudicial error. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005) (fundamental error review applies when a defendant fails to object to alleged trial error).

¶27        The testimony of Azar's wife regarding their financial status went to proving Azar's pecuniary motivation and premeditation of the murder. However, the jury did not find premeditation had occurred, instead returning a guilty verdict for second-degree murder. *See* A.R.S. §§ 13-1105(A)(1), -1104(A). Moreover, it had no relevance to the issues in this case—accident or self-defense. Therefore, Azar was not prejudiced by the inclusion of the inconsistent statements.

## C.        Preclusion of Evidence Regarding Gang Affiliation.

¶28        Azar contends the superior court improperly precluded evidence of the victim's reputation as a gang member. Specifically, Azar argues he should have been permitted to recount statements third parties made to him regarding the victim's gang affiliation because such evidence was not offered to prove that the victim was a gang member, but to explain Azar's state of mind at the time of the shooting. In addition, Azar argues, for the first time, that such statements were also admissible pursuant to Rule 405(A).

¶29        We generally review a trial court's evidentiary ruling for an abuse of discretion. *Ellison*, 213 Ariz. at 129, ¶ 42. Because Azar failed to raise his Rule 405(A) argument at trial, however, we review that claim only for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶ 19.

¶30        Before trial, the State moved in limine to preclude any evidence that the victim was or had been a gang member. Nonetheless, at the hearing on the motion, the prosecutor acknowledged that Azar's belief that the victim may have been "part of some dangerous, violent gang" was relevant "to a self-defense claim," and conceded that in the event Azar testified at trial, he should be permitted to state his belief.

¶31        During opening statements, defense counsel remarked, without objection, that the victim had "a history of gang affiliation." When Azar testified on direct examination, defense counsel asked whether the victim had ever described and explained his tattoos. Without objection,

Azar answered that he had seen one of the victim's tattoos "had a little red cardinal on it" and the word "Glendale," and stated the victim told him he received the tattoo when he was a member of the "Glendale Blood." Without objection, Azar also testified that based on this conversation with the victim, he believed the victim had been a gang member. Later, during redirect examination, Azar again testified, without objection, that he believed the victim had been a gang member, and it caused him concern.

¶32        Moments later, however, when Azar attempted to explain a seemingly incriminating statement he had made to his wife, that the shooting was "100 percent [his] fault," by recounting statements his coworkers had made about the victim, the prosecutor objected on hearsay grounds, which the trial court sustained. Counsel and the court then conferenced in chambers, and defense counsel argued that Azar needed to explain that he made the statement to his wife because he had been warned by coworkers that the victim was a gang member and had chosen to befriend him anyway. The trial court sustained the objection, finding the coworkers' statements about the victim's possible gang affiliation or dangerousness were hearsay and more prejudicial than probative. When Azar resumed testifying, he explained that he told his wife the shooting was his "fault" because he felt terrible for the victim's family, his family, and "everybody involved," not because he believed he was culpable for the victim's death.

¶33        During closing argument, defense counsel referenced Azar's testimony regarding his tattoo conversation with the victim, and argued that the jury should "factor" that information and its effect on Azar's state of mind when evaluating whether he acted reasonably under the circumstances.

¶34        Out-of-court statements are "admissible when they are offered to show their effect on one whose conduct is at issue." *State v. Hernandez*, 170 Ariz. 301, 306 (App. 1991). Because Azar sought to introduce the third-party statements to demonstrate their effect on him, not to prove the truth of the matter asserted, the statements were not hearsay. *See* Ariz. R. Evid. 801.

¶35        Nonetheless, otherwise admissible evidence may be excluded if its probative value is substantially outweighed by, among other things, a danger of unfair prejudice, confusion of the issues, or needless presentation of cumulative evidence. Ariz. R. Evid. 403. "A proper Rule 403 balancing of probative value and prejudicial effect begins with a proper assessment of the probative value of the evidence on the issue for which it is offered."

*Shotwell v. Donahoe*, 207 Ariz. 287, 296, ¶ 34 (2004) (internal quotation omitted). "The greater the probative value . . . and the more significant in the case the issue to which it is addressed, the less probable that factors of prejudice or confusion can substantially outweigh the value of the evidence." *Id.* (internal quotation omitted). "If the issue is not in dispute, or if other evidence is available of equal probative value but without the attendant risks of the offered evidence, then a greater probability of substantial outweighing exists." *Id.*

¶36 Applying these principles here, the third-party statements that Azar sought to introduce regarding the victim's prior gang affiliation were of limited probative value because Azar had already recounted the victim's direct statements acknowledging his previous gang membership. That is, the coworkers' statements added nothing material to the case, but served to reinforce that the victim was a disreputable person. Therefore, because the victim's direct statements to Azar were of greater probative value than the third-party statements, and that evidence was not only available but admitted without objection, the trial court did not abuse its discretion by precluding the third-party statements under Rule 403.

¶37 Turning to Azar's claim that the third-party statements attesting to the victim's gang affiliation were admissible under Rule 405(A) to prove the victim's reputation for violence, we likewise find no error. First, we note that Azar, notwithstanding his belief that the victim had previously been a gang member, characterized the victim as a "nice guy" and a "nice, big, relaxed teddy bear kind of guy." On this record, there is no basis to conclude that the third-party statements would have shown, to the contrary, that the victim had a reputation for violence because defense counsel only represented that the statements supported Azar's belief that the victim had been in a gang. Nonetheless, even if the third-party statements demonstrated that the victim had a reputation for violence, Azar has not shown that he was deprived of "a right essential to his defense." *See Henderson*, 210 Ariz. at 567, ¶ 19. He argues on appeal that such evidence was admissible to show that the victim "may have been the initial aggressor in the incident," but he testified that the victim had no weapon and never touched him, and explained that he only felt intimidated because the victim, though seated, "made himself [look] big." Thus, Azar made no claim that the victim was in any way physically aggressive before Azar brandished the gun. Equally important, Azar had the opportunity to present his defense that he acted reasonably based on his belief that the victim had been a gang member, both through his testimony and defense counsel's closing argument. Therefore, the trial court did not err, much less

commit fundamental, prejudicial error, by excluding the third-party statements.[5]

## D.    Jury Instructions.

**¶38**        Azar argues the trial court erred by failing to *sua sponte* instruct the jury on the lesser-included offenses of manslaughter and negligent homicide. Because Azar failed to object to the instructions given and did not request the lesser-included offense instructions, we review this claim only for fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567, ¶ 19; *see also* Ariz. R. Crim. P. 21.3(c) ("No party may assign as error on appeal the court's giving or failing to give any instruction or portion thereof . . . unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of his or her objection.").

**¶39**        In a non-capital case, the trial court is not required to instruct on every lesser-included offense supported by the record. *State v. Gipson*, 229 Ariz. 484, 486, ¶ 13 (2012); *see* Ariz. R. Crim. P. 21.3(c) cmt. Instead, the court has a duty to provide a lesser-included offense instruction only when the absence of such an instruction "would fundamentally violate [the] defendant's right to a fair trial" and interfere with the defendant's "ability to conduct his defense." *State v. Lucas*, 146 Ariz. 597, 604 (1985), *overruled in part on other grounds by State v. Ives*, 187 Ariz. 102, 106–08 (1996). Indeed, trial judges should "exercise restraint in instructing *sua sponte* on lesser included offenses," and, in general, a trial court "should withhold charging on lesser included offenses unless one of the parties requests it" because the issue is "best resolved . . . by permitting counsel to decide on tactics." *Gipson*, 229 Ariz. at 487, ¶¶ 15–16 (internal quotations omitted).

---

[5]        Citing *State v. Zamora*, 140 Ariz. 338, 341 (App. 1984), the State argues that gang membership does not correlate to a "reputation for violence" and therefore evidence of gang affiliation is not admissible under Rule 405(A). As noted by the State, in *Zamora* this court upheld the trial court's determination "that the victim's alleged gang membership was not relevant to his reputation for violence." *Id*. In affirming the trial court's exclusion of the gang affiliation evidence, however, we expressly noted that the defendant had not shown that he knew the victim was a member of a gang or that "such alleged membership in any way affected or was related to the reasonableness of his actions on the night in question." *Id.* Therefore, *Zamora* is inapposite.

¶40        In this case, Azar's strategy by claiming the shooting was either an accident, or an act of self-defense, was to avoid conviction of any lesser included offenses. Indeed, he objected to the trial court's inclusion of an instruction on the lesser-included offense of second-degree murder. When a defendant assesses the evidence presented by the State and concludes that the evidence may be insufficient "to secure a conviction of the greater crime," the decision to forego jury instructions on lesser-included offenses may not constitute strategic error, but a viable strategy to "secure a complete acquittal." *State v. Vanderlinden*, 111 Ariz. 378, 379–80 (1975); *see State v. Krone*, 182 Ariz. 319, 323 (1995) (there may well be cases in which the defendant will be confident enough that the State has not proven murder that he will want to forego lesser-included offense instructions and take his chances with the jury.) Because the record reflects that Azar adopted this strategy, the trial court's failure to instruct the jury on manslaughter and negligent homicide did not interfere with his right to present his defense. *Id.* ("A defendant should not have a lesser included instruction forced upon him."). Therefore, the trial court did not commit fundamental, prejudicial error by failing to *sua sponte* instruct the jury on the lesser-included offenses.

## CONCLUSION

¶41        For the foregoing reasons, we affirm Azar's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA