665 P.2d 972

STATE of Arizona, Appellee,

v.

John Harvey ADAMSON, Appellant.

No. 5155.

Supreme Court of Arizona,
In Banc.

April 11, 1983.
Rehearing Denied June 22, 1983.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Criminal Div., Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

Martin & Feldhacker by William H. Feldhacker and Gregory H. Martin, Scottsdale, for appellant.

GORDON, Vice Chief Justice:

On October 17, 1980, a jury found appellant guilty of first degree murder for the bombing death of newspaper reporter Donald Bolles. Following an aggravation-mitigation hearing on November 14, 1980, the defendant was sentenced to death. Appellant now challenges the conviction on the basis of several allegations of error. We have jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and A.R.S. § 13–4031. We affirm.

Adamson was charged with the June 2, 1976, bombing murder of Donald Bolles. The evidence at trial showed that Bolles, an investigative reporter for the Arizona Republic newspaper, had arranged to meet the defendant at a Phoenix hotel in order to gather information for a potential news story. Two notes concerning the meeting were found after the bombing at Bolles' office. Bolles went to the hotel at the designated time and waited for Adamson in the lobby. While Bolles was waiting, he received a telephone call from an individual he later identified as the defendant. Bolles later stated that Adamson wanted to change the place of the meeting and asked Bolles for directions to his office. Bolles then went to his car and began backing out of the parking space in route to the newly-arranged meeting. As he was backing out a bomb exploded sending pieces of Bolles' car throughout the parking lot and into a neighboring construction site. Witnesses testified that the force of the explosion shook neighboring buildings.

Several rescuers administered first aid to the victim who was still conscious although critically injured. Both of his legs and one arm were severely mutilated. Bolles made statements to the rescuers which implicated the defendant and asked one witness to call his wife. He mentioned the defendant's name several times and stated that "Adamson [set or sent] me." He also told the individuals rendering first aid, "You better hurry up, boys. I feel like I'm going."

The next day the victim responded to questions from the Phoenix Police by means of finger and hand signals. Bolles indicated that he had gone to the hotel the day before to meet Adamson and had received a call from him while waiting for his arrival. Bolles identified a driver's license photograph of the defendant and indicated that he was the man Bolles had met four days earlier while investigating the same story. After having both legs and one arm amputated, Bolles died June 13, 1976.

Intensive police investigations in the days immediately following the bombing revealed the structure of the bomb and that it was a radio-controlled device. The police also established that the defendant was in-

volved in the incident and a warrant was issued to search his apartment. In searching Adamson's residence the police found materials similar to those used to construct the bomb which was attached by magnets to the underside of Bolles' automobile. Literature which contained information concerning the making of explosive devices was also seized. Further investigations revealed that Adamson had purchased remote control equipment two months earlier at a hobby shop in San Diego, California which could have been used to trigger the explosive device. Furthermore, in May, 1976, Adamson had gone to the Arizona Republic parking lot and asked the guard where "Don-So-and-so['s]" car was, saying he had some papers to drop off in the car. Adamson and his companion then went to an automobile dealership and inspected the underside of several cars similar to that owned by Bolles. In route to the dealership the defendant told the individual riding in his car that "he was going to blow up a car" and when asked why, Adamson responded because "this guy was giving people a lot of hard times and stepping on people's toes." At trial testimony was given to establish that Adamson was paid $10,000 to kill Donald Bolles.

Adamson originally pled guilty to second degree murder. As required by his plea bargain, Adamson testified against James Robison and Max Dunlap in Cause No. CR–96127. Robison's and Dunlap's convictions were reversed and remanded by this Court for new trials in *State v. Robison,* 125 Ariz. 107, 608 P.2d 44 (1980) and *State v. Dunlap,* 125 Ariz. 104, 608 P.2d 41 (1980). Adamson refused to testify at the retrials of Robison and Dunlap unless the state met new demands. The state brought a special action in this Court to determine whether Adamson had breached his plea agreement by refusing to testify without the granting of his new demands. The Court ruled that the plea agreement had been breached and reinstated the original information charging open murder. *Adamson v. Superior Court,* 125 Ariz. 579, 611 P.2d 932 (1980). It is from the judgment of conviction of first degree murder based on the reinstated

charge that defendant now appeals. Further facts will be set out as necessary in the discussion of the issues raised on appeal.

The defendant's Petition for Review of the denial of his Rule 32 petition was consolidated with this appeal pursuant to Ariz. R.Crim.P. 31.4(b)(2).

Statements and Notes of Victim

A. Hospital Statements

The day after the bombing three detectives went to the hospital to question Bolles about the bombing. In response to their questions Bolles indicated that he had gone to the hotel to meet the defendant and that while at the hotel he received a call from Adamson. Bolles also identified a photograph of Adamson and indicated that the defendant was the person he had intended to meet on the morning of June 2nd. Appellant contends that the trial court erred in denying his motion to suppress the hospital statements on the grounds that they were inadmissible hearsay.

At the outset we set forth the standard for review: A trial court's denial of a motion to suppress will not be reversed in the absence of a clear abuse of discretion. *State v. Ferreira,* 128 Ariz. 530, 627 P.2d 681 (1981). The trial court ruled that the statements were admissible as dying declarations under Ariz.R.Evid. 804(b)(2). That rule requires the following: (1) that the statements in this case are being used in a homicide prosecution; (2) the statements were made by a declarant while believing his death was imminent; and (3) that the statement concerned the cause or circumstances of what he believed to be his impending death. Defendant objects to the admission of the statements under this rule because there is no evidence that the victim believed death was imminent at the time the statements were made. We disagree. The law does not require that there be a direct assertion by the declarant that he is dying at the time the statements were made. Udall & Livermore, Law of Evidence § 133 (2d ed. 1982). The party offering dying declarations may show that the victim was under a sense of impending

death either by express language of the deceased or by the indubitable circumstances. *Collins v. State,* 37 Ariz. 353, 294 P. 625 (1930). In this case the state has shown both. Witnesses who were at the scene of the bombing described Bolles' legs as having the consistency of hamburger. One witness testified that he had seen a piece of flesh the size of a softball on the pavement as he was rushing across the hotel parking lot towards Bolles' car. At the scene of the bombing the victim made the following statement to rescuers: "You better hurry up, boys. I feel like I'm going." Several hours after the bombing the victim's right leg was amputated. The hospital statements were made one day after the bombing. At the time of the statements Bolles was in grave condition in the intensive care unit. Under these conditions it is reasonable to conclude that when the statements were made Bolles was under a sense of impending death. There was no error in admitting the hospital statements.

## B. Statements at the Scene

▪ Immediately after the bombing Bolles made several statements to the individuals who were rendering emergency care. These statements indicated that in some manner the defendant was involved in the bombing. The victim further stated that a mafia-related organization could have played a role in the bombing. The trial court denied the defendant's motion to suppress these statements allowing them to come in as evidence by applying both the excited utterance and dying declaration exceptions to the hearsay rule. On appeal appellant contends that the statements should not have been admitted at trial since they were not based on the personal knowledge of the victim.

▪ A trial court's ruling on whether a particular statement was in fact an excited utterance will not be reversed absent a clear abuse of discretion. *State v. Dale,* 113 Ariz. 212, 550 P.2d 83 (1976); *State v. Kevil,*

111 Ariz. 240, 527 P.2d 285 (1974). An excited utterance is: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ariz.R.Evid. 803(2). In the instant case there is no question that an exciting event had occurred and that the statements in question occurred immediately thereafter. The victim's statements related to the bombing since they were made for the precise reason of revealing who was responsible for the bombing and setting up Bolles. See *State v. Kevil, supra.* Furthermore, there is no question that the victim's statements were dying declarations. Ariz.R. Evid. 804(b)(2). Bolles expressly stated that he felt like he was going and the statements concerned the cause and circumstances of what he believed to be his impending death.

▪ There is also a general requirement imposed on declarations coming in under all exceptions to the hearsay rule that the declarant, like witnesses, must have had an opportunity to observe or personal knowledge of the fact declared. *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981); *State v. Dixon,* 107 Ariz. 415, 489 P.2d 225 (1971); Ariz.R.Evid. 602. Bolles, an investigative reporter, told rescuers that he was investigating "a mafia called Emprise * * *" and " * * * the mafia was responsible." The victim also stated that "Adamson did it * * *" and "Adamson [set or sent] me." We believe that Bolles' statements regarding the mafia and Emprise, as well as his statement that "Adamson did it * * *", were not within his personal knowledge[1] since they were mere suspicions. The statements were not "based on events perceived by [Bolles] through one of the physical senses." 3 Weinstein Evidence § 602[01] at 602–2. Therefore, the trial court erred in allowing these statements to be admitted.

Error does not require reversal if it can be said beyond a reasonable doubt that it had no influence on the verdict of the jury.

1. The statement "Adamson [set or sent] me" was within Bolles' personal knowledge since Adamson had arranged the meeting and called Bolles at the hotel to re-arrange the location of the meeting, thus luring Bolles into his bomb-rigged car.

*State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980). "The question is whether, without this evidence, the appellate court can say, beyond a reasonable doubt, that the jury would have found the defendant guilty." *Id.* at 453, 622 P.2d at 12. In this case we believe that this question can be answered affirmatively.

Robert Lettiere testified that he went to the Arizona Republic parking lot with Adamson and overheard him ask the guard where "Don so-and-so's car was." Adamson told Lettiere that he "was looking for a certain white car." (Bolles' car was white.) He also told Lettiere that he was going to blow a car up because this guy was stepping on people's toes and that he was being paid $10,000 for the job. After leaving the Arizona Republic parking lot the defendant and Lettiere went to a Datsun dealership where Adamson examined the underside of several cars similar to that owned by Bolles. The day after the bombing Adamson and his wife visited Lettiere where the defendant told Lettiere "You didn't believe I could do something like that * * * and you got to believe it now." Adamson also said that if he ever bought a car himself he "would have to get a Datsun because it sure as hell took a jolt." He also said "He could be in the same boat that Don Bolles was in because he had botched the job." Evidence was introduced which established that Adamson purchased a device at a San Diego hobby shop which could have been used to trigger the bomb. A battery, tape, and magnets similar to that used to construct the actual bomb were found in Adamson's apartment. The Anarchist Cookbook which contained information that would be helpful in constructing the type of bomb used in this case was also found in the apartment. Statements made by Bolles at the hospital and notes that he had written indicated that Bolles went to the hotel to meet Adamson. Bolles' on-the-scene statement "Adamson [set or sent] me" was also properly available for the jury's consideration. Finally, Gail Owens, an acquaintance of Adamson, testified that the day of the bombing the defendant called her and said that something had happened and that he would not see her for awhile. In light of this evidence we can say beyond a reasonable doubt that without the improperly admitted on-the-scene statements the jury would have found the defendant guilty.

## C. Notes of the Victim

■ Defendant argues on appeal that the trial court erred in denying his motion to suppress two notes allegedly written by the victim because they were not properly authenticated. One handwritten note was found in Bolles' desk written on an Arizona Republic memorandum pad and read:

"John Adamson

Lobby at 11:15

Clarendon House

4th & Clarendon"

The other typewritten note had been placed in the typewriter of Bernie Wynn, the victim's supervisor, and read:

"Bernie:

"I've gone to meet that guy with the info on Steiger at the Clarendon House. Then to Sigma Delta Chi. Back about 1:30 p.m.

Bolles"

At the trial the state called Wynn who testified as to the circumstances under which he found both notes. He also testified that it was Bolles' habit to leave notes such as *the typewritten note* which indicated when he would return to the office.

The defendant has not shown this Court that the trial court clearly abused its discretion in denying the motion to suppress these notes. *State v. Ferreira, supra.* Rule 901(b)(2) Ariz.R.Evid. allows the proponent of a written note to establish its authenticity through the use of nonexpert opinion as to the genuineness of handwriting based on familiarity with that handwriting. At the motion to suppress hearing and the trial Wynn testified that he had worked with Bolles for fourteen years, was familiar with his handwriting, and that the handwritten note was in fact in the victim's handwriting. Thus, *under Rule 901 authorship of the handwritten note was properly shown.*

As for the typewritten note, Wynn testified at the motion to suppress hearing as follows: it was the victim's habit to leave such notes; the note was typed on newspaper copy paper; the note was placed in Wynn's typewriter after 5:30 the afternoon before the bombing and before 10:30 the morning of the bombing; and the note ended with the victim's typewritten signature. We believe that typewritten notes, like telegrams, may be authenticated by circumstantial evidence. ˙*People v. Thompson,* 111 Mich.App. 324, 314 N.W.2d 606 (1982); *Harlow v. Commonwealth,* 204 Va. 385, 131 S.E.2d 293 (1963). Proof of circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing. *Champion v. Champion,* 368 Mich. 84, 117 N.W.2d 107 (1962); *Bain v. Commonwealth,* 215 Va. 89, 205 S.E.2d 641 (1974); McCormick on Evidence § 222 (2d ed. 1972). We believe the facts in this case provide the necessary circumstantial evidence to indicate that the victim authored the note.

Defendant also argues that the trial court erred in admitting both notes because neither was dated. As a result the defendant believes that it is uncertain whether the notes referred to the June 2nd meeting. We believe that the evidence before the trial court was sufficient to establish that the notes referred to the June 2nd meeting at the hotel with Adamson. *State v. Ferreira, supra;* Ariz.R.Evid. 901(a).

■ Adamson's final argument is that the trial court erred in admitting the notes since they were hearsay because they were used to show Bolles' intent to meet the defendant at the scene of the bombing. While this may be true, Arizona follows the state of mind exception to the hearsay rule which is applicable to the victim's notes. *State v. Ramirez,* 116 Ariz. 259, 569 P.2d 201 (1977); Ariz.R.Evid. 803(3).

■ A statement offered to show the state of mind of a declarant/victim may be admissible under the state of mind exception to the hearsay rule as long as the declarant/victim's state of mind is relevant to an issue involved in the criminal proceed-

ing. *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981); *State v. Ramirez, supra; State v. Lehman,* 126 Ariz. 388, 616 P.2d 63 (App.1980). The notes were relevant in this case since they were used to show that the victim intended to meet Adamson at the hotel. Establishing the defendant's presence at the hotel near the time of the bombing was a critical factor in the state's case. We therefore find that the trial court was correct in finding that the notes could be properly authenticated, the contents were relevant, and that they were admissible under Rule 803(3).

## Search of Defendant's Apartment

### A. Probable Cause

■ Defendant contends that the warrant to search his apartment was invalid because the affidavit for the warrant omits detailed references to persons or other sources as the underlying circumstances for the affiant's belief in some of the facts he stated in the affidavit. As a result, defendant contends that the trial court should have granted his motion to suppress the use at trial of items discovered in the search of his apartment.

No search warrant shall be issued except on probable cause. U.S. Const.Amend. IV; A.R.S. § 13–1443 (in effect at the time the warrant was issued and now codified at A.R.S. § 13–3913). Probable cause for the issuance of a search warrant exists only where the facts presented to a magistrate are based on personal knowledge or trustworthy information sufficient to warrant a person of reasonable caution to believe that seizable items are located on the premises or persons sought to be searched. *State v. Maddasion,* 24 Ariz.App. 492, 539 P.2d 966 (1975), *affirmed,* 130 Ariz. 306, 636 P.2d 84 (1981). In establishing probable cause "only the probability, and not a prima facie showing, of criminal activity" is necessary. *State v. Emery,* 131 Ariz. 493, 505, 642 P.2d 838, 850 (1982), quoting from, *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637, 645 (1969).

In the instant case there is a detailed three and one-half page statement of facts verified by one of the investigating police officers referring to extensive investigation which produced much information as to the bombing incident. The affidavit cites specific persons interviewed. It includes the detailed results of preliminary investigations regarding the structure of the explosive device. During the course of police investigations Adamson's four year old son identified a photograph of his father that was printed in the newspaper and then pointed to a photograph of magnets similar to the ones used to attach the explosive device to Bolles' car and said "And there's my daddy's tools." Finally, the affidavit includes the information gained from Bolles at the hospital the day after the bombing regarding his plans to meet the defendant the day of the bombing.

■ We have consistently held that affidavits for search warrants should be interpreted in a common sense and realistic fashion. *State ex rel. Collins v. Superior Court,* 129 Ariz. 156, 629 P.2d 992 (1981); *State v. Torrez,* 112 Ariz. 525, 544 P.2d 207 (1975), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 767 (1976). If a magistrate has probable cause to issue a search warrant, that warrant should not be invalidated by hypertechnical interpretation. *State ex rel. Collins v. Superior Court, supra; In re One 1970 Ford Van, I.D. No. 14GHJ55174, L. No. CB 4030,* 111 Ariz. 522, 533 P.2d 1157 (1975). Defendant objects to the use of his son's statements by claiming that statements of young children are presumed to be unreliable for trial use. Evidence supporting a finding of probable cause need not meet the standard for admissibility at trial. *Spinelli v. United States, supra; State v. Berge,* 130 Ariz. 135, 634 P.2d 947 (1981); *cf. Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (affidavit for search warrant may be based on hearsay information). Thus, even if it were true that Adamson's son was not competent to testify at trial, we believe that the statements made while pointing at the pictures were properly considered together with other information when deciding if probable cause had been established.

Adamson argues that Bolles' statements made at the hospital were not reliable because he was in critical condition. We have already determined that those statements were admissible at trial and for these reasons conclude that they could be used to show probable cause for the search.

In consideration of the deference to be given to the trial court's denial of defendant's motion to suppress and finding of probable cause, as well as the factual detail of the affidavit, we find that there was probable cause sufficient to allow the warrant to issue.

## B. Scope of Search

■ Adamson argues that the search of his apartment should have stopped when the magnets were found since those were the only items for which there was probable cause to search. The warrant under which Adamson's apartment was searched listed the following items as being used as a means for committing a public offense: magnets, electric blasting caps, ¾" black plastic electrical tape, electric switching devices, small gauge insullated wire, wire cutters and pliers, literature relating to use of explosives, and purchase receipts for the above listed items. Preliminary investigations which were cited in the affidavit for search warrant indicated that the explosive device attached to the floorboard section of Bolles' car was constructed with these materials. Defendant objects to the admission of the following items since he claims they were seized without probable cause: 1—small spool uninsulated wire, 1—small spool insulated wire, 1—6 volt Eveready battery, 1—¾" black plastic electrical tape partially used, 1—9 volt Eveready transistor battery, 1—"Anarchist Cookbook" by William Powell, and 2—homemade green 2⅜ inch × 1 inch blasting fuse firecrackers. We have already determined that the affidavit in support of the warrant adequately established probable cause for search of the items listed therein. Thus, all of the items listed on the warrant and found in Adam-

son's apartment were properly seized. We also believe that the searching officers properly seized the materials not listed on the warrant since those items were reasonably related to the crime. *State v. Poland,* 132 Ariz. 269, 645 P.2d 784 (1982); *State v. Scigliano,* 120 Ariz. 6, 583 P.2d 893 (1978); A.R.S. § 13–3916(C). It was later shown that batteries were integral to the operation of the explosive device and it is reasonable to believe that literature related to the construction of such a device would be found along with the materials used. We hold that the items defendant objects to were properly seized.

## C. Nighttime Search

Defendant next raises the argument that there was not "good cause" for service of the search warrant at night.[2] Adamson suggests that impending destruction of evidence is the only grounds available to justify a nighttime search. We disagree. The affidavit in support of the nighttime search provided: "Due to the seriousness and nature of the crime involved it is felt swift and immediate serving of the warrant is necessary regardless of the time. Acting quickley [sic] is also in the best interest of preserving safety and expediancy [sic] of solving the crime as soon as possible." We note that the source of the Arizona statute providing for nighttime searches was taken from the State of California. We therefore look to decisions of the California courts. *State v. Jackson,* 117 Ariz. 120, 571 P.2d 266 (1977).

Absent an abuse of discretion, a magistrate's finding of reasonable necessity for a nighttime search will not be disturbed on appeal. *People v. McCarter,* 117 Cal. App.3d 894, 173 Cal.Rptr. 188 (1981). If the general affidavit in support of the search warrant together with the separate sworn statement of good cause for a nighttime search reasonably support the inference that the interests of justice are best served

by the authorization of a nighttime search, then service of a warrant in the nighttime is proper. *People v. McCarter, supra; People v. Mardian,* 47 Cal.App.3d 16, 121 Cal. Rptr. 269 (1975). In the instant case an egregious crime had been committed. The police had been carrying on intensive investigations since the bombing occurred. Attempts at serving the warrant began before ten p.m. The police had spent most of June 5, 1976 drafting the affidavit in support of the warrant and upon its completion immediately went to the home of Maricopa County Superior Court Judge Rufus Coulter to have it reviewed, sworn to, and signed. The police then went directly to Adamson's home and began the search. Under these circumstances we believe that there was no abuse of discretion in issuing the nighttime warrant since it was supported by "good cause" and therefore proper under A.R.S. § 13–1447.

### The Anarchist Cookbook

Adamson argues that it was error for the trial court to admit any portion of "The Anarchist Cookbook" by William Powell because it had no relevancy to the issues to be resolved in the case. The trial judge granted part of Adamson's motion in limine and allowed in as evidence only Chapter 4 entitled "Explosives and Booby Traps" together with the cover sheets of the book.

Rule 402 Ariz.R.Evid. states that all relevant evidence is admissible. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401 Ariz.R.Evid. The trial court is allowed reasonable discretion in determining relevance and admissibility of offered evidence, and such discretion will not be disturbed on appeal unless it clearly has been abused. *State v. Mosley,* 119 Ariz.

2. A.R.S. § 13–1447 (in effect at the time the warrant was issued and now codified at A.R.S. § 13–3917) provides: "Upon a showing of good cause therefor, the magistrate may, in his discretion insert a direction in the warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant may be served only in the daytime. For the purpose of this section night is defined as the period from ten p.m. to six-thirty a.m."

393, 581 P.2d 238 (1978); *State v. Sturgis*, 113 Ariz. 311, 553 P.2d 665 (1976). We do not believe that the trial court abused its discretion in admitting this evidence. The trial judge is in the best position to determine the relevancy of an exhibit since he can consider all of the evidence together and determine which items have a "tendency" to make the existence of a fact of consequence more or less probable than it would be without the evidence. Chapter 4 of "The Anarchist Cookbook" contained information concerning general safety guidelines to follow when constructing an explosive device as well as a discussion of the use of blasting caps and electronic detonation. The explosive device in the instant case utilized blasting caps and was electronically detonated. Furthermore, the cookbook taken together with the other items found in Adamson's apartment tends to prove that the defendant had the materials available to him to construct an explosive device. We therefore find that the trial court did not err in admitting this portion of "The Anarchist Cookbook."

### Dynamite Fuse

█ Defendant contends that the trial court committed reversible error by failing to grant Adamson's motion for mistrial in regards to testimony concerning a dynamite fuse. As a result of a pretrial motion, the trial judge allowed the state to present evidence concerning dynamite fuse but not two homemade firecrackers. During the trial it became evident that dynamite fuse had not been found in the search of defendant's apartment; rather, homemade firecrackers with dynamite fuse in them had been found. Up until this point, however, it had been the assumption of the defense, state, and trial court that the police had discovered a separate coil of dynamite fuse. In fact, defense counsel elicited testimony from Sergeant Aurelius regarding the dynamite fuse found in Adamson's apartment. The day after Sergeant Aurelius testified about the dynamite fuse, the defense made a motion for mistrial which was denied. In his denial the trial judge stated that if error had been made regarding the fuse, then

evidence could still be brought before the jury to clear up the error.

█ The decision to grant a mistrial is left to the sound discretion of the trial court. In the absence of any showing of abuse of discretion the ruling of the trial court will not be reversed on appeal. *State v. Trotter*, 110 Ariz. 61, 514 P.2d 1249 (1973). We do not believe that the trial court abused its discretion in denying defendant's motion for mistrial. In his own case the defendant called Sergeant Aurelius to explain any misimpression which had been left with the jury. Sergeant Aurelius testified as follows:

"Q. Sgt. Aurelius, do you recall testifying in this trial a few days ago?

"A. I do.

"Q. Do you recall testifying that you found dynamite cord at John Adamson's home on the execution of the search warrant?

"A. I do.

"Q. I wish to ask you at this time, did you find any firecrackers at Mr. Adamson's home?

"A. I did.

"Q. Where were they located?

"A. In a storage room to the rear of the apartment complex.

"Q. And in locating those firecrackers, did you see any type of fuse anywhere else other than the fuse that was in those firecrackers?

"A. No, I did not.

"Q. So to be clear, there was no separate dynamite cord located by you anywhere else.

"A. That's correct."

(Reporter's Transcript, October 14, 1980, pp. 32–33). Any error the trial court may have committed in denying defendant's motion for mistrial was cured by the later testimony of Sergeant Aurelius in defendant's case in chief. *State v. Sustaita*, 119 Ariz. 583, 583 P.2d 239 (1978).

### Magnets, Battery, and Tape

█ Adamson claims that the trial court erred in admitting two magnets, a battery

and a roll of electrical tape. Prior to their admission the record established that the items were not the same size as the equivalent parts found by the investigators to have been used in the construction of the explosive device. Therefore, the defendant contends, the evidence was irrelevant under Rule 401 Ariz.R.Evid.

As stated before, "relevant evidence" means evidence having a "tendency" to make the existence of a fact of consequence more or less probable. Rule 401 Ariz.R.Evid. Evidence is relevant if it has any basis in reason to prove a material fact in issue or if it tends to cast light on the crime charged. *State v. Moss,* 119 Ariz. 4, 579 P.2d 42 (1978). In determining relevancy and admissibility of evidence the trial judge has considerable discretion. *State v. Starks,* 122 Ariz. 531, 596 P.2d 366 (1979). We believe that the trial court properly found the magnets, tape and battery relevant. All of those items tended to establish that the defendant had the materials and means available to him for construction of an explosive device. The items found in Adamson's apartment were substantially similar to the parts that were found by investigators to have been used to construct the bomb. The availability of materials which could be used to make a bomb, plus the fact that a bomb was made with similar materials, increases the "tendency" that the defendant was responsible for the bombing of the victim. While we find that the trial judge properly admitted the magnets, tape and battery, we note that the weight given to this evidence in the determination of this matter was within the discretion of the jury. 1 Wigmore on Evidence § 29 (1940). We find no error.

### Alibi Witness Comment

Defendant's next allegation is that his motion for mistrial should have been granted when during the cross-examination of Thomas O'Grady, Adamson's alibi witness, a statement was made regarding the defendant being arrested for a matter unrelated to the bombing. Adamson claims that this was evidence of another crime being used to show his character which is not permitted under Rule 404 Ariz.R.Evid. Defendant's motion for mistrial was denied and Adamson declined to accept the court's offer to strike the reference to the unrelated arrest.

During trial Adamson called Thomas O'Grady who gave testimony concerning defendant's alibi defense. On cross-examination the prosecutor attempted to reconstruct the time-frame during the relevant periods of time on June 2, 1976. O'Grady testified as follows:

"Q. Still, how did you arrive at the conclusion, if you did, that this [June 2, 1976] was the day of the bombing?

"A. Well, of course, we knew what the calendar was and we just verified it.

"Q. I missed that.

"Q. [sic] What was on the calendar and we checked the date.

"Q. You mean you reconstructed again?

"A. Well, probably from—from Wednesday on when we heard that there might be a chance that somebody was involved in it.

"Q. When did you hear that?

"A. I think it was either the next day or two days later at the most.

"Q. How did you hear that?

"A. As I recall, Mr. Adamson was arrested for defrauding an innkeeper.

"Q. Did you hear that they were looking for Mr. Adamson?

"A. Something to that effect. There was a lot of conversation in all them bars at that particular time of this incident.

"Q. Is that how you heard it?

"A. Yes, sir.

"Q. And then you reconstructed from that point back?

"A. Just—just as well as we could. And from what we could remember, we figured if what the newspaper said was true we were with Johnny right around that particular time of day." (Reporter's Transcript, October 13, 1980, pp. 119–21).

The prosecutor was attempting to establish how O'Grady could be so sure about the chronology of events on June 2nd. Adam-

son's arrest was in no way related to this line of questioning. In discussing the mistrial motion the prosecutor told the trial judge that he "had no idea what Mr. O'Grady was going to say" and that "Mr. O'Grady blurted it out * * *."

 When a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the discretion of the trial court which must evaluate the situation and decide if some remedy short of mistrial will cure the error. *Executive Jet Management & Pilot Service, Inc. v. Scott,* 629 S.W.2d 598 (Mo.App.1981). A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted. *Watkins & Faber v. Whiteley,* 592 P.2d 613 (Utah 1979). In the absence of any showing of abuse of discretion, a trial court's denial of a motion for mistrial will not be disturbed on appeal. *State v. Trotter, supra.*

We have reviewed the circumstances and find no abuse of discretion by the trial court in denying Adamson's motion for mistrial.

### Attorney-Client Privilege

 Defendant contends that certain questions asked by the prosecutor on cross examination improperly infringed upon the attorney-client privilege and thereby prejudiced him in the eyes of the jury. Adamson's allegations of prejudicial error stem from the following questions asked by the prosecutor of Stephen Scott, an attorney who spoke with Adamson the night of the bombing:

"Q. Did you see Mr. Adamson that evening?

"A. No.

"Q. Any reason why you didn't, Mr. Scott?

"A. Why I didn't see him?

"Q. Yes. Weren't you going to represent him?

"A. I didn't know at that time.

"Q. Oh, then why was it that you were being contacted?

"A. For the possibility of representing him.

"Q. I see. But you did not know in your mind as to whether you would or not.

"A. No, I couldn't have at that time. I didn't know Adamson. I had never met him. I didn't know what the possible charges were.

"No, I couldn't at that point in time have made a definite decision.

"Q. Did you at that time plan to talk to Mr. Adamson eventually?

"A. Yes.

"Q. When did you plan to talk to him?

"A. The first time I talked to him was that night.

"Q. The night of June 2?

"A. Yes.

"Q. Where did you talk to him?

"A. On the same conversation on the telephone.

"Q. Oh, he was at Neal Roberts' and you also talked to Mr. Adamson on the telephone.

"A. That is correct.

"Q. Did you talk to Mr. Adamson about representation?[3]

"MR. MARTIN: Your Honor, I'm going to object and invoke the attorney-client privilege as to any conversations that were had between Mr. Scott and Mr. Adamson.

"THE COURT: Sustained.

"Q. (By Mr. Schafer) Did you have any conversation with Mr. Adamson concerning the bombing?

"MR. MARTIN: Your Honor, I'm going to object again.

"THE COURT: Sustained."

(Reporter's Transcript, October 13, 1980, pp. 85–6.) A motion for mistrial was made on the grounds that the prosecutor's questions were designed to probe into areas that were not of legitimate inquiry and were asked

---

**3.** It should be noted that Scott later testified that he ultimately represented the defendant for a short period of time.

for the purpose of forcing defendant to invoke the attorney-client privilege.

■ At the outset we note that the decision to grant a mistrial is left to the sound discretion of the trial court. In the absence of any showing of abuse of discretion the ruling of the trial court will not be reversed on appeal. *State v. Trotter, supra.* As noted previously, a mistrial should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted. *Watkins & Faber v. Whiteley, supra.* In the instant case the questions leading up to defendant's objections were preliminary in nature and concerned only the circumstances under which Scott spoke with Adamson. Preliminary matters such as the fact of consultation, as well as the dates, places, and means of consultation, are usually outside the coverage of the privilege. *State v. Alexander,* 108 Ariz. 556, 503 P.2d 777 (1972); Udall & Livermore, Law of Evidence § 74, at 141 (2d ed. 1982). The prosecutor's question, "Did you talk to Mr. Adamson about representation?" was a legitimate question designed to establish whether or not an attorney-client relationship actually existed. The next question, "Did you have any conversation with Mr. Adamson concerning the bombing?" went to the substance of Scott's telephone conversation with the defendant and therefore was within the protection of the attorney-client privilege.[4] See Udall & Livermore, Law of Evidence § 74 (2d ed. 1982).

In *State v. Holsinger,* 124 Ariz. 18, 601 P.2d 1054 (1979) we considered an allegation of error similar to what the defendant now suggests. In that case the defendant's conviction was reversed due to several instances of improper questioning of witnesses by the prosecutor of which forcing the defendant to invoke the attorney-client privilege was only one. In the instant case, however, only one question was asked which infringed on Adamson's attorney-client privilege, and that question was un-

answered. There is no evidence that the prosecutor made a practice of improperly questioning witnesses. Furthermore, the jurors were instructed that they were not to concern themselves with the reasons for evidentiary rulings and that no inferences were to be drawn from any of the rulings. (Instruction No. 3). The judge who presided over this five-week trial necessarily weighed the effect of the asking of this one unanswered question on the entire proceeding when he denied the motion for mistrial made on that basis. He could very well have felt, as we do after reading the record in this matter, that the effect was little or none. From a procedural standpoint, defendant is not entitled to a perfect trial, just a fair one. *State v. Hunt,* 8 Ariz.App. 514, 447 P.2d 896 (1968). The record here reveals an eminently fair trial. For all of these reasons we find no abuse of discretion in the action of the trial court in denying defendant's motion for mistrial.

### Exclamation to the Jury

■ After the evidentiary portion of the trial and before closing arguments by the parties a man yelled "he's guilty!" to the jury while they were returning to their rooms at the hotel. Defendant's counsel made a motion for a mistrial on the grounds that the effect of such a statement was to imperil Adamson's right to a fair and impartial trial. The trial judge denied this motion.

As we have noted previously, the decision to grant a mistrial is left to the sound discretion of the trial court. In the absence of any showing of abuse of discretion, the ruling of the trial court will not be reversed on appeal. *State v. Trotter, supra.* We do not believe the trial judge abused his discretion in denying defendant's motion for mistrial. Judge Birdsall questioned the jury about the incident asking if it would in any way influence or affect their deliberations or verdict. All of the jurors answered that it would not. Furthermore, prior to beginning deliberations the jury was instructed

---

4. For purposes of this discussion we will assume that an attorney-client relationship did in

fact exist under A.R.S. § 13–4062(2).

that they were not to consider anything heard outside the courtroom concerning the case. (Instruction No. 3) The trial judge was in the best position to determine the effect that the statement had on the jury. He was familiar with all of the evidence before the jury and could therefore conclude that in light of this evidence defendant's allegation of error was not adequate grounds for a mistrial. We find no error.

### Additional Instruction

■ Appellant maintains that the trial court erred by giving the jury a supplementary instruction in response to a note from the jury. After retiring to deliberate the jury sent a note to the judge which read: "There is a question on Instruction No. 13. Were the instructions to the jury written especially for this case, or are they written as general guidelines for the jury to follow? Please clarify Instruction No. 13." Instruction No. 13[5] dealt with the defendant's claim that he was not present at the time and place the alleged crime was committed. Judge Birdsall stated that an additional instruction was necessary to clarify Instruction No. 13 in light of Instruction No. 10[6] given concerning aiding and abetting. The supplemental instruction, No. 19, given over defendant's objection, read as follows:

"All of the instructions given to you including this instruction are instructions in the law that may apply to this case. In order to answer the question which you have asked, the Court is going to give you this additional instruction.

If you find beyond a reasonable doubt that the crime of murder in the first degree has been committed as that crime is defined in instruction No. 8, it is not necessary that you find that the defendant was present at the time of the actual killing, if you find beyond a reasonable doubt that the defendant knowingly and with criminal intent and with the specific intent to kill aided and abetted the crime of murder. In order to find that the defendant aided and abetted you would have to find that he was a person who did aid and abet as those terms are defined in instruction # 10 and if you have a reasonable doubt that he did so aid and abet you must find the defendant not guilty.

"You must consider this additional instruction together with all of the other instructions which have been given to you."

Ariz.R.Crim.P. 22.3[7] expressly allows the trial court to give additional instructions in response to the jury's requests. In the instant case notice was given to all parties and discussion was had with Judge Birdsall prior to the instruction being read to the jurors as well as copies being distributed to them. The instruction itself was not misleading and was a proper statement of the law. Its sole purpose was to provide guidance to the jury in properly applying Arizo-

---

5. Instruction No. 13 read as follows:
 "The defendant has produced evidence that he was not present at the time and place the alleged crime was committed. If you have reasonable doubt whether the defendant was present at the time and place the alleged crime was committed, you must find the defendant not guilty."

6. Instruction No. 10 read as follows:
 "All persons concerned in the commission of an offense who either directly and actively commit the act constituting the offense, or who knowingly and with criminal intent aid and abet in its commission, or, whether present or not, who advise and encourage its commission, are regarded by the law as principals in the crime thus committed and are equally guilty thereof.
 "For one person to aid and abet another in the commission of a criminal offense means to knowingly and with criminal intent aid, promote, encourage or instigate by act or counsel, or by both act and counsel, the commission of such offense."

7. Rule 22.3 reads as follows:
 "After the jurors have retired to consider their verdict, if they desire to have any testimony repeated, or if they or any party request additional instructions, the court may recall them to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or instructions given only after notice to the parties."

na's law of aiding and abetting to the facts of the case. We find no error.

### Post-Conviction Relief

■ Combined with defendant's appeal of his conviction and sentence is an appeal from the trial court's dismissal of Adamson's petition for post-conviction relief pursuant to Ariz.R.Crim.P. 32.1. At the outset we note that a petition for post-conviction relief is addressed to the discretion of the trial court. *State v. Kidwell,* 106 Ariz. 257, 475 P.2d 241 (1970); *State v. Littles,* 123 Ariz. 427, 600 P.2d 40 (App.1979). The granting or denying of such a petition is discretionary with the trial court and will not be reversed by this court unless it affirmatively appears that there has been an abuse of discretion. *State v. Sisk,* 112 Ariz. 484, 543 P.2d 1113 (1975); *State v. Turner,* 92 Ariz. 214, 375 P.2d 567 (1962).

■ The basis of Adamson's Rule 32 petition is that the state failed to disclose material required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that juror misconduct occurred during voir dire. The state responded by showing that each of the allegedly undisclosed items actually were either disclosed, contained material found in earlier reports that were disclosed, or were compiled after the jury had convicted Adamson. The substance of Adamson's claim of jury misconduct is that one of the jurors may have had information that was not disclosed on voir dire regarding the charges against the defendant. No specific facts were given in support of this allegation.

In *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977), we interpreted the portion of Ariz.R.Crim.P. 32.6 [8] concerning summary disposition of Rule 32 petitions. In applying the decision of the United States Supreme Court requiring a full factual determination if a petition for post-conviction relief presented a colorable claim, *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), we defined "colorable claim" as follows: "To be colorable, a claim has to have the appearance of validity, i.e., if the defendant's allegations are taken as true, would they change the verdict?" 114 Ariz. at 194, 560 P.2d at 49. In the instant case Judge Birdsall reviewed all of the documents concerning Adamson's Rule 32 petition and concluded that "no material issue of fact or law exists which would entitle the petitioner to relief under Rule 32 and that no purpose would be served by any further proceeding." (Minute Entry, July 23, 1981) The trial court specifically found "that there have been no *Brady* violations and that there [was] no newly discovered evidence as proof of any juror misconduct. The matters which the petitioner claims were not disclosed pursuant to *Brady* and which are also claimed to be newly discovered evidence, were disclosed to the petitioner prior to trial. The police reports dated after trial were concerned with on-going investigation into those same matters. Nothing new of any significance whatsoever was developed." (Minute Entry, July 23, 1981) We believe that these findings support the conclusion that Adamson's petition did not present a "colorable claim."

The trial judge was in a much better position than we are to determine the weight to be given the defendant's claims in his petition and whether or not the allegations taken as true would change the verdict. In light of the trial court's findings, and the well-recognized discretion which rests with the trial court, we hold that the trial court did not abuse its discretion in

8. The relevant portion of Rule 32.6 reads as follows:

"c. Summary Disposition. The court shall review the petition within 10 days after the petitioner's reply was due. If, upon reviewing the petition, response, reply, files and records, and disregarding defects of form, it determines that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, it may order the petition dismissed, or grant leave to file an amended petition. Otherwise, the court shall direct that the proceeding continue and set a hearing within 10 days."

denying defendant's petition for post-conviction relief.

### Ex Post Facto

■ Defendant argues that being sentenced pursuant to A.R.S. § 13–703 (effective May 1, 1979), rather than A.R.S. § 13–453 which was in effect at the time the offense was committed, violated the ex post facto clause of the United States Constitution. As discussed in *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982), the change in Arizona's death penalty statute after *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied*, 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) requiring the trial court to consider all mitigating circumstances was both procedural and ameliorative. *See also State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983). Likewise, the renumbering of the statute after the changes were made by the Arizona Legislature did not affect any substantive rights granted by the statute. Therefore, there is no ex post facto violation.

### Sentencing

■ Although the defense did not contest the sentence of death on appeal, this Court reviews the record of each case to independently determine if the trial court correctly applied aggravating and mitigating circumstances. *State v. Gretzler, supra; State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982). The trial court found two statutory aggravating circumstances—A.R.S. § 13–703(F)(5) (the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value) and A.R.S. § 13–703(F)(6) (the defendant committed the offense in an especially heinous, cruel or depraved manner).

There is no question that A.R.S. § 13–703(F)(5) applies to the "hired killer" situation. *See State v. Gretzler, supra; State v. Poland,* 132 Ariz. 269, 645 P.2d 784 (1982). In such a case the defendant clearly commits "the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." In the instant case evidence was presented at trial which supports a finding of this aggravating factor. The defendant told Robert Lettiere that he was receiving $10,000 for the bombing. After the bombing Adamson told Lettiere that he was not concerned about his defense because "my people would take care of court costs and everything, and he had some money coming in the next day or so." Finally, Adamson appeared at a Phoenix office three times after the bombing in order to pick up payment for the murder. We conclude that the trial court properly found this aggravating circumstance.

The other aggravating circumstance found by the trial court was that the murder was committed in an especially cruel, heinous and depraved manner. We have recently discussed the factors to be considered in finding this circumstance. See *State v. Gretzler, supra.* In that case we stated that cruelty "involve[s] the infliction of pain on the victims" and the "suffer[ing] of physical or mental pain prior to death." 135 Ariz. at 42, 659 P.2d 1. The defendant must also intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant's acts.

The victim clearly suffered in the instant case. Witnesses who were inside buildings hundreds of feet from the explosion testified that they heard Bolles screaming for help. Bolles had particles from the bomb imbedded in his body. One leg was shattered from the upper hip to his ankle and had the appearance of hamburger. The other leg and one arm were also severely mutilated. The force of the explosion sent a piece of flesh the size of a softball across the parking lot. The means used to kill Bolles made it reasonably foreseeable to Adamson that if Bolles did not die instantaneously there was a substantial likelihood that he would suffer a great deal from his injuries. We therefore find that the murder was accomplished in an especially cruel manner and that the trial court properly

found the aggravating circumstances under subsection (F)(6) of the statute.

In mitigation the appellant presented witnesses who testified that Adamson has cooperated with the United States government and the State of Arizona in criminal investigations. Adamson also stated that he was willing to continue this cooperation. He also asked the trial court to consider in mitigation the length of the legal proceedings in this case since its inception. While we have considered this evidence in mitigation, we feel that it is not sufficiently substantial to outweigh the aggravating circumstances and call for leniency. The death sentence is appropriate in the instant case.

We further find that the imposition of the death penalty in this case is not disproportionate to the same penalty imposed in other cases, considering both the crime and the defendant. We have examined all of the cases in which the defendant received the death penalty based on one or both of the aggravating circumstances found in the instant case. See *State v. Woratzeck*, 134 Ariz. 452, 657 P.2d 865 (1982) (Gordon, V.C.J., concurring in part and dissenting in part); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980); *State v. Clark*, 126 Ariz. 428, 616 P.2d 888, *cert. denied* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980); *State v. Knapp*, 125 Ariz. 503, 611 P.2d 90 (1979). The fact that Adamson was hired and used a bomb to kill his victim makes the crime stand out from previous death penalty cases considered by this court. We consider the bombing-style murder a particularly deplorable crime. Using a bomb to kill an individual is even more offensive than other cases involving cruelty. The fact that the defendant in this case was a hired killer makes the killing especially foul. For these reasons we believe the imposition of the death penalty is justified.

We have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035, and find none.

The judgment of conviction of first degree murder and the sentence of death are affirmed.

HAYS and CAMERON, JJ., concur.

HOLOHAN, Chief Justice:

I concur in the result.

FELDMAN, Justice, dissenting.

I dissent because of my disagreement with the analysis adopted by the majority in the portion of the opinion involving the statements made by Bolles at the scene and at the hospital. In addition to the statements properly admitted under the dying declaration and excited utterance exceptions to the hearsay rule, were the following:

1. One witness was permitted to testify that "the first thing Don Bolles said [at the scene] was Adamson did it. . . . He again said Adamson did it . . . . he had said he was investigating a Mafia called Emprise . . . ."

2. A fireman at the scene was permitted to testify that "I overheard him say he was an investigative reporter that he wanted everybody to know that the Mafia was responsible, and that apparently they had made good on their threats."

3. An officer who interviewed Bolles at the hospital testified that "I asked [Bolles] if he suspected the Emprise Corporation for the bombing and he said he did . . . ."

The effect of these statements was to inform the jury that Bolles had identified the defendant as the perpetrator of this crime and that a Mafia controlled corporation, which wanted to stop Bolles' investigation, had ordered the bombing. The victim, speaking from the grave, was thus allowed to name the criminal and explain the motive.

All this would have been admissible as a dying declaration if there were foundation to establish that the statements were the product of Bolles' personal observation. The record, however, clearly refutes that foundation. Bolles was killed by a bomb

detonated by radio; he had not observed who killed him and was obviously stating his inferences or deductions from those facts which he did know.

While the majority correctly concludes that the mere fact that a statement falls within a hearsay exception does not make it admissible,[1] it completely ignores the serious constitutional problems which result from the interface of hearsay exceptions and the sixth amendment to the Constitution of the United States. The right of an accused to confront and cross-examine an adverse witness is guaranteed by the sixth amendment to the United States Constitution and applied to the States by the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). This right is also protected by art. 2, § 24 of the Arizona Constitution. *State v. Pereda,* 111 Ariz. 344, 345, 529 P.2d 695, 696 (1974). Admittedly, the right has never been considered absolute. *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). Extra-judicial statements may be admitted in evidence without violating the right of confrontation when the declarant is unavailable and the statements bear adequate "indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). This reliability may be inferred where the evidence falls within a "firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. at 2539.

Hearsay exceptions are based upon the presumed reliability of the category of material which fits into the exception. The statements in question here are not admissible as hearsay exceptions because the lack of first-hand knowledge destroyed their reliability. Thus, the admission of these statements was a violation of defendant's sixth amendment right of confrontation which took "from the defendant a right essential to his defense," and is *fundamental* error. *State v. Thomas,* 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

In my view, therefore, this case involves more than technical error in the application of the hearsay rules. Fundamental constitutional error was committed. In light of this error, the question now becomes whether the admission of these statements was harmless. The majority concludes that the error does not warrant reversal. It weighs the evidence which was properly admitted and decides that such evidence was so overwhelming that the jury would have convicted the defendant even in the absence of the statements in question. I find this analysis incomplete because it fails to recognize and consider the constitutional violation.[2] I find it also inaccurate because as a result of

---

1. The hearsay rule is merely an additional safeguard applied to testimonial evidence otherwise admissible. The admission of hearsay statements under an exception to the rule "therefore presupposes that the assertor possessed the qualifications of a witness in regard to knowledge and the like." 5 J. Wigmore, *Evidence in Trials at Common Law* § 1424, at 255 (J. Chadbourn rev. 1974). Arizona Rule of Evidence 602 provides that a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that he has *personal knowledge of the matter.*"

 The rule is of board application and applies specifically to dying declarations:
 Even if the requisite consciousness of death is established, other conditions of admissibility must be met. Rule 804(b)(2) ... contains no specific provision requiring the declarant to have personal knowledge of the facts contained in his declaration. However, the notes to Rule 804(b)(2) indicate that "continuation of a requirement of first-hand knowledge is assured by Rule 602." This is in accord with previous federal law. In *Shepard v. United States* [290 U.S. 96, 101, 54 S.Ct. 22, 24, 78 L.Ed. 196 (1933)], the Supreme Court had stated:
 To let the declaration in, the inference must be permissible that there was knowledge or the opportunity for knowledge as to the facts that are declared.
 The statement of a declarant shot in the back by an unseen assailant as to who shot him cannot be admitted.
 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 804(b)(2)[01], at 804–85 (1981); *see also State v. Dixon,* 107 Ariz. 415, 418, 489 P.2d 225, 228 (1971), applying the same rule to excited utterances.

2. Inexplicably, the majority neither mentions the constitutional error nor considers its effect, even though only a few weeks ago the constitutional ramifications of a similar error were recognized and analyzed. *See State v. Jeffers,* 135 Ariz. 404, 421, 661 P.2d 1105, 1122 (1983).

failing to consider the true issue, the majority applies an incorrect standard in determining whether the error was harmless.

While "overwhelming evidence" of guilt goes a long way in establishing the harmless nature of a trial error, the unfairly prejudicial nature of the error in this case cannot be ignored by emphasizing only the properly admitted evidence. The testimony which was erroneously admitted was of a type most likely to prejudice the defendant—it included the victim's identification of his killer and highly inflammatory references to the Mafia's involvement in the bombing. The tainted evidence was the only direct evidence of the killer's identity and motive. While the judicial process necessarily requires some degree of soothsaying and crystal-ball gazing, I submit that we carry things too far when we conclude beyond a reasonable doubt that a jury, which spent a day and a half deliberating, would have reached the same conclusion in the absence of the most compelling evidence in its possession.

What the majority really concludes is that if they were jurors, they would have found the defendant guilty even without the erroneously admitted evidence. I agree that there was substantial evidence pointing to defendant's guilt and warranting a finding of guilt beyond a reasonable doubt. Nevertheless, I was not a juror and neither were my colleagues. It is irrelevant to speculate on what we would have done if we had been jurors. The defendant was entitled to a trial by a jury uninfluenced by constitutional error. The harmless error test applied by the majority (focusing only on the weight of the properly admitted evidence) violates this guarantee and results in a conviction procured in part by a violation of defendant's right of confrontation and affirmed by this court's usurpation of the function of the jury. *See* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L.Rev. 15, 34–35 (1976); Note, *Harmless Error: The Need for a Uniform Standard,* 53 St. John's L.Rev. 541, 560–61 (1979). The United States Supreme Court addressed this issue in *Kotteakos v.*

*United States,* 328 U.S. 750, 763–64, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

> [I]t is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error. . . . This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

*Id.* (Citations and footnote omitted.)

This raises the real issue in this case: What is the test to be applied in determining whether fundamental constitutional error is harmless? At one time all constitutional error was thought to require "automatic reversal—such errors were never to be considered harmless." Cameron & Osborn, *When Harmless Error Isn't Harmless,* 1971 Law & Social Order 23, 23. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court determined, however, that some constitutional error could be considered "harmless error." The Court explained:

> We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

In fashioning a harmless-constitutional-error rule, we must recognize that harm-

less-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

. . . We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171. There we said: *"The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."* Id., at 86–87, 84 S.Ct. at 230.

*Id.* at 22–23, 87 S.Ct. at 827 (emphasis supplied). Thus, the *Chapman* decision placed the burden on "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828.

The *Chapman* "contribution to the verdict" test was applied by the Court in a subsequent decision, *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In *Harrington,* the Court held that evidence admitted in violation of the confrontation clause was harmless error because it was merely cumulative of other properly admitted evidence on the same issues and the defendant's guilt was otherwise established by "overwhelming evidence."

At first glance, the *Harrington* decision appears to qualify the "contribution" test developed in *Chapman* by adopting an "overwhelming evidence" standard. As one of my colleagues explains:

[I]t would be difficult to say that the confessions of the two codefendants in this case "did not contribute to the verdict," as required by *Chapman.* Even if the other evidence were overwhelming, the confessions were strong evidence implicating the defendant and were no doubt considered by the jury and "con-

tributed" to its verdict. This, in fact, was the view taken by Justice Brennan in dissent, who felt that *Harrington* overruled *Chapman* while purporting to apply it. Thus, it is possible that a *sub rosa* easing of the *Chapman* test has occurred, and that it might be slightly easier in the future to establish the harmlessness of constitutional error. Under *Harrington,* such an error would appear to be sufficiently harmless where the other evidence is so great and convincing as to be considered overwhelming.

*Cameron & Osborn, supra,* at 27 (footnote omitted).

As my colleague also points out, however, the impact of *Harrington* on the *Chapman* harmless error test (contribution to the verdict) must be considered in the context of the facts in the *Harrington* case. In *Chapman,* the only evidence of the defendant's guilt was circumstantial. 386 U.S. at 25–26, 87 S.Ct. at 829. In *Harrington,* however, there was direct, untainted evidence, including the defendant's own statements, which established the *same facts* as the erroneously admitted evidence. 395 U.S. at 252–54, 89 S.Ct. at 1727–29. Thus, the improperly admitted evidence was merely cumulative. Under those facts, the Court could conclude that the constitutional error did not contribute to the verdict. *See* Note, *supra,* at 548.

On careful analysis, it does not appear that the *Harrington* court applied an "overwhelming evidence" of guilt test as the standard to find the error harmless. The Court stated that the appellate court must determine "the probable impact of the [error] on the minds of an average jury." 395 U.S. at 254, 89 S.Ct. at 1728.

The majority's use of the "overwhelming evidence" test in the case at bench without regard to the probable impact of the tainted evidence on the jury is put in even greater doubt by the Supreme Court's recent decision in *Connecticut v. Johnson,* —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983).

In *Johnson,* the Supreme Court affirmed the decision of the Connecticut Supreme Court reversing a defendant's conviction on

the ground that the trial court had given the jury a conclusive presumption instruction on the question of intent in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In affirming the state supreme court's holding that this error was not harmless, the Court stated:

If the jury may have failed to consider evidence of intent, a reviewing court cannot hold that the error did not contribute to the verdict. The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant. To allow a reviewing court to perform the jury's function of evaluating the evidence of intent, when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made.... See *County Court of Ulster County v. Allen,* 442 U.S. 140, 160 [99 S.Ct. 2213, 2226, 60 L.Ed.2d 777] (1979) ("[It is] irrelevant in analyzing a mandatory presumption ... that there is ample evidence in the record other than the presumption to support a conviction").

*Johnson,* —— U.S. at ——, 103 S.Ct. at 977.

The decision in *Johnson* is a plurality decision in which but four Justices joined; a fifth, Justice Stevens, concluded that no federal question was raised by the Connecticut court's refusal to hold the error harmless and concurred in the opinion for the purpose of allowing disposition of the case. Four Justices dissented, but none of them did so on the ground that *Harrington* overruled *Chapman* and provided an overwhelming evidence test as a substitute for a contributing to the verdict test. The dissent discusses the proper test with concern for determining "the effect of the error on the jury's verdict." *Id.* at ——, 103 S.Ct. at 982.

The issue debated in *Johnson* was actually whether automatic reversal is required in the face of constitutional error in instructing on a mandatory presumption and whether such an error must necessarily

have influenced the verdict. While the effect of a *Sandstrom* instruction on a jury's deliberations may be open to question, we must acknowledge that every juror understands what the Mafia is and why it would order the death of a reporter engaged in investigating one of its enterprises. Every juror would understand the victim's identification of his killer. We need not indulge in mental gymnastics to imagine the effect of such evidence.

By failing to recognize the fundamental nature of the error and applying the "overwhelming evidence" test, the majority also ignores its own precedents in cases involving constitutional error. For instance, in *State v. Thomas,* 130 Ariz. 432, 636 P.2d 1214 (1981), we found the trial court committed fundamental error in permitting the prosecutor to support the credibility of the complaining witness by establishing that the witness was very religious and went to church "almost every Sunday." In reversing, we stated the test for fundamental error as follows:

Fundamental error has been variously defined by this court as "such error as goes to the foundation of the case or takes from the defendant a right essential to his defense," *State v. Gamble,* 111 Ariz. 25, 26, 523 P.2d 53, 54 (1974).... If it is determined that error occurred, the prejudicial nature of the unobjected-to error must be evaluated in light of the entire record. If there is substantial evidence in the record to support the verdict *and* it can be said that the error did not, beyond a reasonable doubt, contribute significantly to the verdict, reversal is not required. *If, however, it appears that the error did contribute to or significantly affect the verdict, fundamental error was committed and reversal is mandated ....*

*Id.* 435–36, 636 P.2d at 1217–18 (citations omitted) (emphasis supplied); *see also State v. Ray,* 123 Ariz. 171, 598 P.2d 990 (1979). In fact, this very week the court, without discussion, recognized the contribution to the verdict test for harmless error in *State v. Martin,* 135 Ariz. 552, 554–55, 663 P.2d 236, 238–39 (1983).

Under the contribution test for harmless error set forth in *Thomas, supra,* the error in the case at bench would require reversal. The erroneously admitted evidence was of a type most likely to influence the jury and thus contribute to the verdict. Yet, one minute of cross-examination of Bolles would have revealed that he did not know the killer or motive from first hand knowledge, but only from deduction. Without this bit of information, we cannot exclude the reasonable possibility that the jury was influenced by testimony prohibited by the constitution and that the error therefore contributed to the verdict.

There is little to be gained and much to be lost by use of an overwhelming weight of the evidence test. To be gained is the added speed and efficiency resulting from allowing appellate court judges to weigh evidence and convict by deciding "beyond a reasonable doubt" that the jury would have convicted. The constitution, however, was intended to prevent the sacrifice of principle in the interests of expediency. In any event, there is little need for it; if the evidence is so overwhelming this court can tell beyond a reasonable doubt that the jury would have convicted the defendant without the tainted evidence, then surely this court can tell beyond a reasonable doubt that the next jury would reach the same result. Why then do we need to violate the constitution? Would it not be better to observe constitutional precepts rather than to discard them in our haste to the gallows? It may not make much difference to this defendant, but in the long run faithful adherence to constitutional concepts and procedures will make a great deal of difference to the integrity of the judicial process.

Application of the contribution test as the proper standard for constitutional error cases would permit us to avoid reversal where the error, though constitutional, was merely technical or minor. *See State v. Sanchez,* 130 Ariz. 295, 635 P.2d 1217 (App. 1981) (reading testimony of witness to jury in absence of defendant found harmless). It also permits us to avoid reversal if the tainted evidence is not highly prejudicial but is merely cumulative of other, overwhelming evidence on the same point. *See Harrington v. California, supra.* Application of the proper standard permits the appellate court to focus on the nature of the error in light of the entire record. The question to be determined will be: Was the constitutional error of a type or nature that it is reasonably possible that it influenced or contributed to the verdict? If not, then the judgment can be affirmed. By following this standard, appellate judges could use their knowledge and experience to measure the impact of the tainted evidence on the jury—a judicial function—without requiring them to act as jurors and weigh the evidence in order to speculate on what the jurors would have done under a set of facts which never existed.

I recognize also that in cases such as this there is pressure to bring the accused to speedy justice with as little attention to "legal technicalities" as possible. This pressure is implicit in every case which, like this one, has received and merits public attention and outcry. However, the constitution is not a technicality, and the function of the judiciary, difficult as it may be at times, is to withstand such pressures and to recognize that society's great interest in punishing the guilty is outweighed by its *greater* interest in maintaining the integrity of the constitution.

In my view, therefore, the court has failed to recognize, discuss or analyze the serious constitutional error which was committed in this case. As a result, it has applied a test for harmless error which, if it is to be used at all, should be used only where the error was of a non-constitutional, non-fundamental nature. Therefore, I dissent and would reverse and remand the case for a new trial.