NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

MICHAEL J. COWLED, *Appellant*.

No. 1 CA-CR 23-0085
FILED 3-21-2024

Appeal from the Superior Court in Maricopa County
No. CR2019-007261-001
The Honorable Margaret B. LaBianca, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jana Zinman
*Counsel for Appellee*

The Law Office of Kyle T. Green, Tempe
By Kyle T. Green
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Daniel J. Kiley and Judge D. Steven Williams joined.

_____

**C A T T A N I**, Judge:

¶1        Michael J. Cowled appeals his convictions and sentences for fraudulent schemes and artifices, theft, and forgery.  For reasons that follow, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        Unable to work due to a disabling accident, "Deborah Smith" relied for her income on social security disability checks and payments from a long-term disability insurance policy.[1]  In 2016, Smith's disability insurance provider offered a lump-sum settlement option contingent upon her meeting with a financial advisor.  Smith approached her neighbor, Cowled, who worked in the financial sector.  Cowled agreed to help Smith and gave her marketing materials for an annuity provider, recommending she invest in an individual retirement account ("IRA") or an annuity.  Smith stressed that, if she chose to accept the settlement, she would need to receive a minimum monthly income of $500 from any investment.  Cowled assured her she would receive that amount by following his recommendations.

¶3        By the end of 2016, Smith agreed to invest in an IRA or annuity, signing documents provided by Cowled that listed an annuity provider's name.  Smith accepted the lump sum settlement and listed Cowled as her financial advisor.  Cowled directed Smith to sign documents associated with the settlement and received $750 for acting as her adviser.  Smith endorsed the settlement check, totaling $67,458.69, to Cowled, with the understanding that he would immediately transfer the money to an IRA or annuity.

¶4        In January 2017, Cowled gave Smith her monthly check and paid a portion of her outstanding bills.  Shortly after, Smith's accountant informed her that the appropriate tax forms for her settlement had not been completed.  Smith learned that she owed approximately $10,000 in taxes,

_____

[1]        We use a pseudonym to protect the victim's privacy.

even though Cowled had told her she would owe approximately $2,000. When asked about this, Cowled created an invoice backdated to December 2016, stating that Smith owed him fees totaling $57,662, which included $1,000 for an "IRA setup" and $35,000 for a "rendered" retainer fee. This invoice did not reflect fees that Smith had agreed to pay, and Cowled later stated that he "dummied up" the invoice to avoid tax liability.

¶5　　　Between February and July 2017, Smith continued to receive monthly payments from Cowled, although the amounts fluctuated. By August 2017, the monthly payments grew increasingly inconsistent, with some checks bouncing and Cowled replacing the checks with cash payments. By the end of 2017, Smith stopped receiving payments entirely. Cowled became evasive with Smith, eventually telling her that he had invested her money in "flipping houses." He claimed that everyone involved in this venture had lost their money.

¶6　　　Suspicious, Smith contacted law enforcement in November 2017 and again in March 2018. An investigator obtained records showing that Cowled had deposited Smith's settlement funds into his business savings account, without ever acquiring an IRA or annuity. The annuity provider Cowled had listed confirmed that there was no record of an account under Smith's name.

¶7　　　The investigator also discovered that between December 2016 and July 2017, Cowled transferred $55,506.93 of Smith's money into his checking account. Cowled used funds in that account to pay for food, clothing, trips, vehicles, and miscellaneous personal bills. There were no transfers to the annuity provider or withdrawals consistent with any type of investment. After July 2017, Cowled's accounts fluctuated between a low to zero balance, regularly incurring overdraft fees for insufficient funds.

¶8　　　The State charged Cowled with one count each of fraudulent schemes and artifices (a class 2 felony), theft (a class 2 felony), and forgery (a class 4 felony). Before trial, Cowled provided documents to defense counsel, purportedly signed by Smith in January and February 2017, avowing that he and Smith discussed lower risk options, she chose to accept the risk of non-conventional investments, understanding Cowled could not be held liable for "bad investment outcomes," and that Smith had authorized him to make decisions on her behalf.

¶9　　　At trial, Smith testified that she had neither seen nor signed these documents. And a forensic document examiner confirmed that the

3

signatures on those documents had been transferred from another document signed by Smith.

**¶10**        Cowled testified at trial that his bank records would not show he invested the money by making a loan because the loan was a "handshake" agreement paid "from a bag of cash" he kept in his home. Cowled named Jim Yanello as the individual who lost the money in a "house flipping scheme." He claimed that Yanello disappeared, only resurfacing after a failed suicide attempt. Cowled did not subpoena Yanello for trial. The superior court continued trial for an extra day to permit Yanello to attend, but when he did not appear, the court denied Cowled's request to further continue the trial or to declare a mistrial.

**¶11**        The jury found Cowled guilty as charged, and the court sentenced him to a presumptive term of 2.5 years' imprisonment for the forgery conviction, followed by two concurrent terms of supervised probation on the remaining counts. Cowled timely appealed. We have jurisdiction under A.R.S. § 13-4033(A)(1).

## DISCUSSION

**¶12**        Cowled argues that the superior court abused its discretion by denying his motion to continue trial or, in the alternative, declare a mistrial given Yanello's unavailability to testify. Cowled contends the court's ruling violated his Sixth Amendment and due process rights to call material witnesses and present a complete defense.

**¶13**        A motion to continue is not granted as a matter of right, and rests solely within the court's discretion. *State v. Jackson*, 112 Ariz. 149, 154 (1975). We will not disturb the superior court's decision unless the defendant shows resulting prejudice. *State v. Forde*, 233 Ariz. 543, 555, ¶ 18 (2014). Similarly, the superior court has broad discretion to grant or deny a motion for mistrial. *State v. Bible*, 175 Ariz. 549, 598 (1993). The "declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983). We review claims implicating a defendant's constitutional rights de novo. *State v. Sanchez-Equihua*, 235 Ariz. 54, 56, ¶ 7 (App. 2014).

**¶14**        A criminal defendant has the right to present a complete defense, compel the attendance of witnesses, and offer testimony that would be "relevant and material to the defense" under his Sixth Amendment and due process rights. *Washington v. Texas*, 388 U.S. 14, 17–19, 23 (1967). Such rights, however, are not absolute. *State v. Harrod*, 218

Ariz. 268, 276, ¶ 20 (2008). The defendant must attempt to secure the attendance of witnesses to exercise his right to compulsory process. *See State v. Espinosa*, 101 Ariz. 474, 476 (1966) (finding no constitutional violation when the defendant made no attempt to find or subpoena the witness); *State v. Russell*, 175 Ariz. 529, 535 (App. 1993) (finding no constitutional violation when the defendant "never invoked the powers of the court to compel" witness testimony).

¶15 The superior court "may continue trial only on a showing that extraordinary circumstances exist, and that delay is indispensable to the interests of justice." Ariz. R. Crim. P. 8.5(b). And the court may grant a continuance in the middle of trial only under exigent circumstances. *State v. Eisenlord*, 137 Ariz. 385, 391 (App. 1983). The court has discretion to deny a continuance based on the absence of an allegedly material witness when the defendant has failed to act diligently in securing the attendance of the witness, *State v. Richie*, 110 Ariz. 590, 592 (1974), or when "[n]o showing has been made that the witness could have been located and produced within a reasonable time had a continuance been granted," *State v. Cook*, 172 Ariz. 122, 125 (App. 1992).

¶16 Before trial, Cowled disclosed Yanello as an out-of-state witness, but he did not request a subpoena. The superior court continued the trial ten times at Cowled's request, including three times for Yanello's travel preparations. The parties indicated that they needed time to schedule transportation for out-of-state witnesses and jointly requested a "date certain" for trial. When trial began, Cowled did not express concerns about the attendance of his witnesses. On the fourth day of trial, however, Cowled informed the court that Yanello was ill and might not be able to attend trial. The court explained that if the witness had an illness preventing attendance, Cowled needed to provide documentation from a doctor and proof that he had already made travel arrangements for that week. Later that day, after the State rested its case-in-chief, Cowled told the court that Yanello would be arriving the following evening and could provide testimony on the sixth day of trial. Cowled offered no additional details regarding Yanello's alleged illness or travel plans. Nevertheless, the court agreed to end the fifth trial day early and allow for Yanello's attendance the following day.

¶17 On the fifth day of trial, Cowled informed the superior court that Yanello still felt ill and had a high temperature. But Cowled gave contradictory information about possible travel arrangements, acknowledging that Yanello had been non-committal and had not purchased a plane ticket. Cowled further admitted that he had no medical

documentation regarding Yanello's illness. At that point, the State voiced its concern that Yanello had no intention of attending trial. The court similarly expressed "skepticism" as to whether Yanello was "a theoretical witness and not an actual witness," adding that Cowled's counsel had not been forthcoming about Yanello's travel arrangements.

¶18 The next day, Cowled moved to continue trial or, in the alternative, declare a mistrial based on Yanello's unavailability. Cowled asserted that Yanello claimed to have seen a medical professional, but he had not provided any documentation. The State objected to the continuance, arguing that the superior court already made concessions for Yanello to arrive on a later trial date. The State noted that Yanello never agreed to a face-to-face interview and had shown no "actual intent" to appear for trial. The court denied both of Cowled's motions, finding that Cowled failed to present any "actual reliable evidence" of Yanello's illness or intent to attend trial.

¶19 Cowled's assertions of error regarding Yanello's absence from trial are unavailing. The court granted multiple continuances, at least three of which specifically related to Yanello. Cowled never requested a subpoena for Yanello or expressed a concern that Yanello would not willingly attend trial. Cowled did not raise the issue until the fourth day of trial, as the State's case-in-chief drew to a close. Even then, Cowled could not provide a clear answer as to whether Yanello would be traveling to Arizona for trial. Further, Cowled failed to provide documentation or any reliable information to confirm Yanello suffered an illness that prevented him from traveling. And although Cowled claimed on various occasions that travel arrangements had been made, he ultimately acknowledged Yanello had never booked a flight to Arizona.

¶20 Cowled had the right and opportunity to subpoena Yanello for trial, but he did not do so. *See* A.R.S. § 13-4071(D) (entitling a defendant to obtain subpoenas in a criminal proceeding); A.R.S. § 13-4093 (compelling attendance of out-of-state witness). He had ample time to secure travel arrangements for Yanello, but he did not do so. Accordingly, Cowled has not shown he acted diligently to secure Yanello's attendance at trial. *See Richie*, 110 Ariz. at 592.

¶21 Furthermore, Cowled has not demonstrated that Yanello would have attended trial had a continuance or new trial been granted. *See Cook*, 172 Ariz. at 125. As noted by the court, the record suggests that Yanello was merely "a theoretical witness." Without more, the court was justified in concluding that there were no exigent circumstances warranting

a continuance mid-way through trial, *Eisenlord*, 137 Ariz. at 391, or that justice would be "thwarted" without a new trial, *Adamson*, 136 Ariz. at 262. The court did not abuse its discretion by denying Cowled's motions to continue or to declare a mistrial, and those rulings did not violate Cowled's Sixth Amendment or due process rights.

## CONCLUSION

**¶22**         For the foregoing reasons, we affirm Cowled's convictions and resulting sentences.



AMY M. WOOD • Clerk of the Court
FILED:     AA